**FILED**
**U.S. DISTRICT COURT**
**EASTERN DISTRICT ARKANSAS**

JAN 0 7 2022

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

ROBERT REMBISZ and )
CHERYL C. REMBISZ, )
)
Plaintiffs, )
)
v. )
)
WRIGHT MEDICAL TECHNOLOGY, INC., )
a Delaware Corporation, )
)
Defendant. )

MDL No. 2949
4:20-md-2949-KGB

Case No. 4:22-cv-00013-KGB

This case assigned to District Judge Baker
and to Magistrate Judge Harris

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs Robert Rembisz and Cheryl C. Rembisz, by and through their attorneys George E. McLaughlin, McLaughlin Law Firm, P.C., for their Complaint against Defendant, state and allege as follows:

### NATURE OF ACTION

1.     Plaintiffs, Robert Rembisz and Cheryl C. Rembisz bring this action for personal injuries and damages relating to the various Defendant's development, design testing, assembling, manufacture, packaging, labeling, marketing, distribution, supplying, and/or sale to Plaintiff Robert Rembisz of a defective artificial hip product known as Wright Medical Profemur Plus CoCr Modular neck.

## THE PARTIES

2.      At all times relevant hereto, Plaintiff, Robert Rembisz, was and is a resident and citizen of the state of Florida, presently residing in Port Saint Lucie, Port Saint Lucie County, Florida.

3.      At all times relevant hereto, Plaintiff, Cheryl C. Rembisz, was and is a resident and citizen of the state of Florida, presently residing in Port Saint Lucie, Port Saint Lucie County, Florida

4.      At all times relevant hereto, Defendant Wright Medical Technology, Inc., was and is a Delaware corporation, with its principal place of business at 1023 Cherry Road, Memphis, Tennessee 38117, and as such is deemed to be a citizen of the state of Delaware and the state of Tennessee.

5.      Defendant Wright Medical Technology, Inc., at all times relevant hereto, was engaged in the business of designing, manufacturing, distributing, selling, marketing and/or introducing into interstate commerce, either directly or indirectly through third-parties or related entities, various prosthetic orthopedic products, including the Wright Medical Profemur® hip products that are in issue in this civil action.

## JURISDICTION AND VENUE

6.      At all times relevant hereto, Defendant Wright Medical Technology, Inc., distributed its products to consumers in the state of Florida.

7.      Defendant Wright Medical Technology, Inc., is subject to the *in personam* jurisdiction of the United States District Court for the Southern District of Florida, as it did and continues to do business within the state of Florida, is registered with the Corporations Division

of the office of the Florida Secretary of State to do business in the state of Florida and has a designated registered agent for the acceptance of service of process in the state of Florida.

8.      Defendant Wright Medical Technology, Inc., is a corporation and is deemed to reside in a judicial district in which it is subject to personal jurisdiction.  28 U.S.C. §1391(c).

9.      Venue is proper in United States District Court for the Southern District of Florida, pursuant to 28 U.S.C. § 1391(a) and (c), as Plaintiffs reside in Port Saint Lucie County, Florida, within the jurisdictional boundaries of the United States District Court, Southern District of Florida, and a substantial part of the events giving rise to this claim occurred in counties that are within boundaries of the Southern District of Florida.

10.     But for Case Management Order No. 1, entered on March 11, 2021, Doc. No. 56, In Re: Profemur Hip Implant Products Liability Litigation, MDL 2949, Case 4:20-md-02949-KGB, permitting direct filing of this civil action into the Eastern District of Arkansas, Plaintiffs would have filed this civil action in the United States District Court for the Southern District of Florida.

11.     This United States District Court for the Eastern District of Arkansas has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12.     The United States District Court for the Southern District of Florida also will have subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13.    Plaintiffs respectfully request that at the time of transfer of this civil action back to the trial court for further proceedings that this case be transferred to the United States District Court for the Southern District of Florida, Fort Pierce Division.

## PLAINTIFF'S PROFEMUR HIP

14.    On June 14, 2010, Plaintiff Robert Rembisz had a Wright Medical artificial hip implanted in the right side of his body in a procedure known as a total hip arthroplasty (THA).

15.    The surgeon who implanted Plaintiff's Wright Medical artificial hip was Vincent Fowble, M.D.

16.    Plaintiff's June 14, 2010, hip implant surgery was performed at Jupiter Medical Center, Jupiter, Florida.

17.    In his total hip replacement surgery on June 14, 2010, Plaintiff Robert Rembisz had implanted in his right hip the following specific Wright Medical devices and components:

        a.    Profemur® Plasma Z Stem
           REF: PHA0-0268
           LOT: 0301041135
           Size 5 Medial Length 125mm
           Implant Material TiAl4V

        b.    Profemur® Plus CoCr Modular Neck
           REF: PHAC-1234
           LOT: 0201053867
           Long/8° A/R Taper SLT

        c.    Conserve® Total Short Neck Sleeve
           REF: 38NS-0035
           LOT: 06856867410
           Implant Material Ti6Al4V

    d. Conserve® Total IDE BHC™ Femoral Head
       REF: 38CH-5410
       LOT: 098606676
       Size 54mm
       Implant Material Alumina Ceramic

    e. Conserve® Plus HA Cup
       REF: 38HA-5460
       LOT: 0501095300
       Shell Size 60mm O.D. 54mm I.D.
       Surface Beaded/HA

18.     Dr. Fowble did not violate any generally accepted standards of care in the field of orthopedic surgery in his care and treatment of Plaintiff in any of the following respects:

    a. In the care or treatment that he provided to Plaintiff prior to beginning the June 14, 2010, hip replacement surgery;

    b. In the information that he did or did not provide Plaintiff prior to beginning the June 14, 2010, hip replacement surgery;

    c. In the selection of the Wright Medical Devices implanted in Plaintiff on June 14, 2010;

    d. In performing the total hip arthroplasty he performed on Plaintiff on June 14, 2010;

    e. In the care or treatment that he provided to Plaintiff, subsequent to Plaintiff's June 14, 2010, hip replacement surgery; and,

    f. In the information that he did or did not provide to Plaintiff subsequent to Plaintiff's June 14, 2010, hip replacement surgery.

19.     Based upon the patient population that Defendant intended the Wright Medical Device to be implanted in, Plaintiff was an appropriate patient to be implanted with the Wright Medical Devices he received on June 14, 2010.

20.     At the time of the Plaintiff's Wright Medical right hip surgery on June 14, 2010, Wright Medical was on notice that Profemur Plus CoCr Modular Necks were expected to suffer from micromotion, fretting corrosion, galvanic corrosion, and ultimately fracture.

21.     At the time of the Plaintiff's Wright Medical right hip surgery on June 14, 2010, Wright Medical did not disclose to Plaintiff's surgeon, Vincent Fowble, M.D., that Profemur Plus CoCr Modular Necks were expected to suffer from micromotion, fretting corrosion, galvanic corrosion, and ultimately fracture.

22.     At the time of the implantation of Plaintiff's Wright Medical Profemur Plus CoCr Modular Neck on June 14, 2010, Wright Medical did not inform Plaintiff's surgeon that it had knowledge that Profemur Plus CoCr Modular Necks were expected to suffer from micromotion, fretting corrosion, galvanic corrosion, and ultimately fracture.

23.     "Patient Testimonials" and "Patient Stories" published by Defendant Wright Medical on Wright Medical's website promoted and illustrated the intended patient population, and activity levels, that Wright Medical intended for the Profemur® components implanted in Plaintiff.

24.     Before or during the course of Plaintiff's June 14, 2010, hip surgery, Defendant arranged for the specific Wright Medical hip components that were implanted in Plaintiff to be delivered to the Jupiter Medical Center and/or Dr. Fowble for implantation in Plaintiff.

25.    Subsequent to the date of implantation of the Wright Medical Device, Plaintiff used his Wright Medical Devices in a normal and reasonably expected manner.

26.    Subsequent to the date of implantation of the Wright Medical Device, Plaintiff used his Wright Medical Devices in a manner consistent with, if not less actively, than many of the representations made in "Patient Testimonials" and "Patient Stories" that appeared on the Wright Medical website(s).

27.    After his initial recovery from the June 14, 2010, hip surgery, for several years Plaintiff's Wright Medical artificial hip performed as expected, and the pain and disability Plaintiff had experienced in his right hip prior to his June 14, 2010, hip replacement surgery had been substantially relieved.

28.    By the year 2020 Plaintiff developed adverse symptoms including, but not limited to, progressively worsening pain in and around his right hip joint, as well as neurologic symptoms including peripheral neuropathy, tinnitus, some balance/coordination issues, a heal fracture as a direct result of those balance/coordination issues, and B12 deficiency.

29.    Laboratory test results reported on May 26, 2020, revealed elevated serum chromium and blood cobalt levels in Plaintiff.

30.    Plaintiff's orthopedic surgeon, Daniel A. Jones, M.D. subsequently, in the year 2021, informed Plaintiff that in his medical judgment it was advisable to undergo a right hip revision surgery to remove the Profemur® hip system, including the Profemur® Plus CoCr Modular Neck and the Profemur® Plasma Z Stem, and replace it with a hip stem system of a different medical device manufacturer, Zimmer-Biomet. Dr. Jones also informed Plaintiff that it would be medically necessary to remove and replace the Conserve® Femoral Head.

31.    On June 28, 2021, Plaintiff Robert Rembisz had a revision surgery performed on his right hip by Daniel A. Jones, M.D., at Cleveland Clinic Martin South Hospital, Stuart, Florida.

32.    Early in his June 28, 2021, Operative Report, Dr. Jones noted, "metallosis debris at the external rotators."

33.    After removal of the Conserve® femoral head from the Profemur® Plus Modular Neck, Dr. Jones noted "a fair amount of black corrosion discoloration at the taper on both components."

34.    Dr. Jones was able to extract the Profemur® Plus CoCr modular neck from the Profemur® Plasma Z Stem by using the Wright Medical neck removal device.

35.    Dr. Jones desired to remove the well-fixed Profemur® Plasma Z Stem from Plaintiff's natural bone femur without performing an extended trochanteric osteotomy.  However, when he attempted to thread the Wright Medical Stem Removal Device [provided by Wright Medical] into the Profemur® Plasma Z Stem he found that the removal device threads were stripped.  He nonetheless gave it a reasonable effort, but the removal device kept "popping off."  Therefore, an extended trochanteric osteotomy was necessary.

36.    Because of the extended trochanteric osteotomy, multiple cables were needed to securely fix the bone at the osteotomy site.

37.    In the June 28, 2021, revision surgery, Dr. Jones, removed the Wright Medical Profemur® Hip System, including the Profemur® Plus CoCr modular neck and Profemur® Plasma Z Stem, as well as the Conserve® Femoral Head, that had been implanted in Plaintiff's right hip in 2010, were removed, and replaced with a femoral stem, femoral head, and a dual mobility bearing, all devices manufactured by Zimmer Biomet.

8

38.     Dr. Jones stated in his revision surgery operative notes that there was significant bleeding throughout the revision surgery that was oozing in nature and very difficult to control.

39.     Plaintiff still experiences residual symptoms following the June 28, 2021, right hip revision surgery.

40.     With the exception of the fact that the Profemur Plus CoCr Modular Neck had corroded at its junctions, Plaintiff's right hip devices were in substantially the same condition in all relevant respects as when they left Wright Medical's control.

41.     With the exception of the fact that the Profemur Plus CoCr Modular Neck had corroded at its junctions, causing metallosis and other adverse reactions in Plaintiff, Plaintiff's right hip was not otherwise in need of hip revision surgery.

42.     With the exception of the fact that the Profemur Plus CoCr Modular Neck had corroded at its junctions, Plaintiff's right hip was reasonably expected to have lasted for the remainder of his life.

## ACCRUAL OF PLAINTIFFS' CAUSES OF ACTION

43.     Prior to the year 2021 Plaintiff had neither knowledge nor notice that there was any defect in the design, manufacture or labeling of his implanted Profemur® Plus CoCr Modular Neck.

44.     Prior to the year 2021 Plaintiff had neither knowledge nor notice that he had been injured by his implanted Profemur® Plus CoCr Modular Neck.

45.     Prior to the year 2021 Plaintiff had neither knowledge nor notice that Plaintiff's implanted Profemur® Plus CoCr Modular Neck had failed.

46.     Prior to the year 2021 Plaintiff was not aware that he had suffered any injury directly or proximately caused by his implanted Profemur® Plus CoCr Modular Neck.

47.    Four years prior to the date of the filing of this Complaint, Plaintiffs' causes of action alleged in this Complaint had not yet accrued.

## THE WRIGHT MEDICAL PROFEMUR® HIP

48.    In approximately the year 1985 a European manufacturer of artificial hip devices, known as Cremascoli Ortho Group ("Cremascoli"), developed the first prototype of what became known as the titanium Profemur® Modular Necks.

49.    The first prototype of what became known as the titanium Profemur® Modular Necks were patented with the European Patent Office by Cremascoli in 1986.

50.    What became known as the titanium Profemur® Modular Necks were first distributed in Europe by Cremascoli in 1986.

51.    The name PROFEMUR® was originated by Cremascoli as a brand name for certain models or designs of its artificial hip devices.

52.    Cermascoli PROFEMUR® prosthetic hip devices are the subject of medical literature published in 1996.  [See: The Modular Prosthesis for Hip Revision Surgery: Experience with the Profemur Stem: Masse, Scagnelli, Trossarello, Buratti, Randelli, Basso, Dei Poli, Giaretta, Leonardi, Massetti, Pugliese: Italian Journal of Orthopaedics and Traumatology-Suppl. 1, Vol XXII. - Fasc. 2- GIUGNO 1996.]

53.    The above referenced 1996 medical literature is cited by Wright Medical in various Wright Medical Profemur® Technical Monographs that it created and distributed. [e.g., PROFEMUR™ TOTAL HIP SYSTEM, PERFORMANCE CHARACTERISTICS OF THE PROFEMUR™ TOTAL HIP SYSTEM, © 2002 Wright Medical Technology, Inc., MH688-102;

and PROFEMUR® R Revision Hip System, TECHNICAL MONOGRAPH, © 2010, Wright Medical Technology, MH688-102, Rev. 6.10.]

54.    In December 1999, Defendant Wright Medical Group, Inc., purchased Cremascoli Ortho, acquiring Cremascoli's Profemur® artificial hip product line, related documents, and manufacturing facilities in Toulon, France.

55.    Based on publicly available patent documents of Cremascoli, it appears that there was a change in the design of the titanium Profemur® modular necks before these products were first distributed in the United States.  [Hereinafter at times referred to as a "re-design".]

56.    Upon information and belief, before the acquisition of Cremascoli by Wright Medical, a re-design of the Profemur® Modular Necks at the mid-body of the neck increased the range of motion of the hip joint in an assembled artificial hip device when used with compatible femoral heads and acetabular components.  [Hereinafter these re-designed Profemur® Modular Necks at times are referred to as the "PHA0" modular necks.]

57.    "Version" is the term Wright Medical used for the different lengths and angles of its Profemur® Modular Necks, identified by unique catalog numbers.  For example, the Wright Medical Profemur® titanium varus/valgus 8° long neck, catalog # PHA0-1254, is or was one "version" of a Wright Medical Profemur® Modular Neck.

58.    By the end of the year 1998, the Cremascoli modular neck product line had been expanded to include additional "versions" of modular necks that did not exist in 1986.

59.    After the acquisition of Cremascoli, Wright Medical expanded the Profemur product line to include additional designs and "versions" of Profemur® Modular Necks that did not exist prior to its acquisition of Cremascoli.

60.    Sometime after the acquisition of Cremascoli, Wright Medical began to refer to some of its products as the "Profemur® Total Hip System."

61.    On September 26, 2000, Wright Medical Technology, Inc. notified the United States Food and Drug Administration [FDA] of its intent to market what it called the "PRO-FEMUR R Revision Hip System" by way of what is known as an Abbreviated 510(k) Premarket Notification.  [See: FDA 510(k) K003016.]

62.    Wright Medical's Abbreviated 510(k) Premarket Notification for the PRO-FEMUR R Revision Hip System Device Description included, "twelve modular necks which are available in six versions and two lengths: Neutral, anteversion/retroversion 8° or 15°, varus/valgus 8°, or combination of anteverted/retroverted – varus/valgus (in both short and long lengths)."

63.    On December 13, 2000, Wright Medical Technology, Inc. received clearance from the FDA to market the PRO-FEMUR R Revision Hip System in the United States.

64.    The FDA itself did not test the safety or efficacy of the Profemur® R Revision Hip System stem, nor the accompanying titanium Profemur® modular necks, as a part of the Abbreviated 510(k) process.

65.    Sometime after December 13, 2000, Defendant Wright Medical Technology, Inc., began to manufacture, label, market, promote, distribute, and sell in the United States the Wright Medical Profemur® Total Hip System and its components, including Profemur® modular necks.

66.    Sometime after December 13, 2000, Defendant Wright Medical Technology, Inc., began to manufacture, label, market, promote, distribute, and sell in the United States Wright Medical titanium Profemur® Modular Necks.

67.     On March 11, 2002, Wright Medical Technology, Inc. filed an application with the United States Patent and Trademark Office to register the trademark "PROFEMUR" in the United States.  [See: U.S. Trademark Registration Number: 76380670.]

68.     After receiving the 510(k) clearance to market the PRO-FEMUR® R Revision Hip System, over time Wright Medical expanded the Profemur® prosthetic hip stem product line to include additional designs of Profemur® Stems, including hip stems branded with names such as the Profemur® Z Hip Stem, Profemur® Plasma Z Hip Stem, Profemur® LX Hip Stem, and the Profemur® TL Hip Stem, among others.

69.     Sometime after January 13, 2000, Defendant Wright Medical began to describe its Profemur® hip devices to its distributors, sales representatives, and surgeons, in printed brochures that it created, copywrote, and distributed, known as "Technical Monographs."

70.     Sometime after January 13, 2000, Defendant Wright Medical began to describe its Profemur® hip devices to its distributors, sales representatives, and surgeons, on and through internet website pages that it created, copywrote, and controlled.

71.     Sometime after January 13, 2000, Defendant Wright Medical began to promote and market its Profemur® hip devices to the general public, on and through internet website pages that it created, copywrote, and controlled.

72.     In various technical monographs material created, copywritten, and distributed by Wright Medical beginning in approximately the year 2002, and continuing into the year 2005, Wright Medical made the following representations, statements, and claims about its Profemur® modular necks:

> The modular neck used with the Profemur® Hip has been employed by Wright
> Cremascoli for over 15 years.  The necks were designed in 1985 and have been

13

> successfully implanted in over 50,000 patients requiring both primary and revision hip procedures.  The necks are used in other Wright Cremascoli hip systems besides the Profemur® Hip.  None of the necks has experienced a clinical failure since their inception.

[e.g., Wright Medical Technical Monograph MH688-102 © 2002, and © 2004.]

73.     Wright Medical knew that the above quoted statement by Wright Medical that, "None of the necks has experienced a clinical failure since their inception," was false when first made.

74.     Prior to December 1, 2008, Wright Medical never corrected or recanted the above quoted statement by Wright Medical that "None of the necks has experienced a clinical failure since their inception."

75.     Wright Medical never distributed in the United States any modular necks that were "designed in 1985" and had been "employed by Wright Cremascoli for over 15 years."

76.     In various Technical Monographs created, copywritten, and distributed by Wright Medical beginning in approximately the year 2002, and continuing into the year 2005, Wright Medical made the following representations, statements, and claims about its Profemur® modular necks:

> The modular neck system, designed by Cremascoli in 1985 (U.S. Patent # 4,957,510), has now been successfully implanted in over 50,000 patients requiring both primary and revision hip arthroplasty.  Extensive laboratory tests have proven that the coupling between the modular neck and femoral implant guarantees:
>
> • Structural reliability
> • Absence of significant micromovement
> • Absence of fretting corrosion

[e.g., Wright Medical Technical Monograph MH688-102 © 2002, and © 2004.]

77.     The above quoted statement by Wright Medical that it, "guaranteed . . . absence of fretting corrosion," with its Profemur® modular necks was false at the time it was first made.

78.     Wright Medical has never corrected or recanted the above quoted statement that it, "guaranteed . . . absence of fretting corrosion," with its Profemur® modular necks.

79.     In various marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients, and the general public, Wright Medical made representations, statements, and claims about its Conserve®, Dynasty®, and Profemur® hip product lines that these products were intended for patients who wanted to return to an "active lifestyle."

80.     In various marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve®, Dynasty®, and Profemur® hip product lines that these products were intended for patients who wanted to return to and engage in various sporting, athletic, and lifestyle activities, such as golf, tennis, running, jogging, dirt bike racing, wrestling, active military duty, karate, skydiving, and heavy labor.

81.     In various marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve®, Dynasty®, and Profemur® hip product lines that these products had been implanted in patients who had returned to or engaged in various sporting, athletic, and

lifestyle activities, such as golf, tennis, running, jogging, dirt bike racing, wrestling, active military duty, karate, skydiving, and heavy labor.

82.     In various marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients, and the general public, Wright Medical made representations, statements, and claims about its Conserve®, Dynasty®, and Profemur® hip product lines that these products were expected to last 10 to 15 years.

83.     In marketing its Conserve®, Dynasty®, and Profemur® hip product lines to surgeons, one or more Wright Medical sales representatives made representations to one or more surgeons that Wright Medical Conserve®, Dynasty®, and Profemur® hip products were expected to last at least 20 years.

84.     Modular necks which Wright Medical represented in literature it created and distributed in the United States for its first marketing of these devices as having been "designed by Cremascoli in 1985," and "successfully implanted in over 50,000 patients," included the original modular neck design that existed prior to the re-designed [PHA0] necks.

85.     The original modular neck design that existed prior to the re-designed [PHA0] necks were sometimes known or referenced by Wright Medical as "PPG" modular necks.

86.     The original modular neck design that existed prior to the re-designed [PHA0] necks were sometimes known or referenced by Wright Medical as "Profemur" modular necks.

87.     The original modular neck design that existed prior to the re-designed [PHA0] necks [i.e., the "PPG" modular necks] were on occasion known or referenced in published medical literature as "Profemur" modular necks.

88.    Cermascoli Profemur® prosthetic hip devices are the subject of medical literature published in 1996. [See: The Modular Prosthesis for Hip Revision Surgery: Experience with the Profemur Stem: Masse, Scagnelli, Trossarello, Buratti, Randelli, Basso, Dei Poli, Giaretta, Leonardi, Massetti, Pugliese: Italian Journal of Orthopaedics and Traumatology-Suppl. 1, Vol XXII. - Fasc. 2- GIUGNO 1996.]

89.    The above referenced 1996 medical literature is cited by Wright Medical in various Wright Medical Profemur® Technical Monographs that it created and distributed. [e.g., PROFEMUR™ TOTAL HIP SYSTEM, PERFORMANCE CHARACTERISTICS OF THE PROFEMUR™ TOTAL HIP SYSTEM, © 2002 Wright Medical Technology, Inc., MH688-102; and PROFEMUR® R Revision Hip System, TECHNICAL MONOGRAPH, © 2010, Wright Medical Technology, MH688-102, Rev. 6.10, among others.]

90.    Prior to the year 2000, Cremascoli had received notice of clinical failures in the form of fractures of its (Cremascoli) modular necks that had been "designed by Cremascoli in 1985".

91.    Prior to the year 2000, Wright Medical had received notice of clinical failures in the form of fractures in Europe of the (Cremascoli) modular necks that had been "designed by Cremascoli in 1985."

92.    Once Wright Medical filed a 510(k) Premarket Notification application to distribute its Profemur® modular necks in the United States, Wright Medical had a duty to report to the FDA any, each, and all events it received notice of where it was claimed that there had been a fracture in a patient of a Profemur® modular neck.

93.     Once Wright Medical received clearance to distribute titanium Profemur® modular necks in the United States as a result of its 510(k) Premarket Notification application, Wright Medical had a duty to report to the FDA any, each, and all events it received notice of where it was claimed that there had been a fracture in a patient of a Profemur® modular neck.

94.     Prior to January of 2005, Wright Medical knew of or received notice of fractures in patients of Profemur® modular necks that had been "designed by Cremascoli in 1985".

95.     Prior to April 19, 2005, Wright Medical did not report to the FDA any of the events it received notice of that a Profemur® modular neck had fractured in a patient.

96.     On or about April 19, 2005, Wright Medical first reported to the FDA that it had received notice that a Profemur® modular neck implanted in a patient had fractured.

97.     After receiving notice of a 2005 Profemur® modular neck fracture, Wright Medical received notice of additional Profemur® modular neck fractures in patients.

98.     Since April 2005, the number of reported titanium Profemur® modular neck fractures has continued to increase each year.

99.     Through March 31, 2018, there had been 768 Profemur modular neck fractures reported to or known to Wright Medical.  [11/06/2018 Transcript, pg. 13, U.S.D.C., Colorado, Applekamp v. Wright Medical, Case No. 17-cv-01601.]

100.    Since that date additional Profemur modular neck fractures have occurred.

101.    To date more than 880 Profemur modular neck fractures have occurred.[1]

_____

[1]   The number of 850 Profemur modular neck fractures to date is estimated, based on the disclosure by Wright Medical's Counsel in open court of 768 known or reported titanium Profemur Modular Neck fractures as of March 31, 2018, knowing that the first fracture reported to the FDA was in April of 2005, calculating the monthly rate of fractures, and extrapolating to the present.

102.    Prior to December 1, 2008, Wright Medical did not inform all orthopedic surgeons in the United States known by it to have implanted its titanium Profemur® modular necks of the reports it had received of titanium modular necks fracturing.

103.    On December 1, 2008, a "Safety Alert" was sent by Wright Medical to certain "medical professionals," which stated, in part, "[W]e have received reports of 35 modular neck failures as of November 21, 2008.  Initial investigations have revealed several commonalities in these failures: heavyweight males, long modular necks and patient activities such as heavy lifting and impact sports."

104.    At the time Wright sent its December 1, 2008 Safety Alert, Wright Medical in fact was aware of more than 35 titanium modular neck failures (by fracture of a Profemur® modular neck) as of November 21, 2008, if all of the reported Wright and Cremascoli modular neck fractures back to the year 1985 were counted.

105.    In the FDA Guidance Documents for Femoral Stem Prostheses DRAFT, dated August 1, 1995, available to industry at the time Wright Medical submitted its Abbreviated 510(k) clearance application for the Pro-Femur R Revision Hip System, the section titled "Contraindicated Weight Limit(s)", stated, in part, "labeling by contraindication as not for use in patients above a certain weight."

106.    In Wright Medical's Instructions for Use [hereinafter "IFU"] that accompanied the Profemur® hip devices distributed in the United States from the date of their introduction into the United States, through June of 2009, Wright stated the use of these devices to be contraindicated in "obese" patients, "[W]here obesity is defined as three times normal body weight."].

107.    Prior to August 2010, Wright Medical did not, in its IFUs for the Profemur® hip devices distributed in the United States, include a warning, precaution or other advisory as to the use of any of its Profemur® modular necks in people who weighed more than a specifically stated patient body weight.

108.    Wright Medical has never stated in its IFUs for the Profemur® hip devices distributed in the United States that the use of any of its Profemur® modular necks was contraindicated in heavyweight males.

109.    Wright Medical has never stated in its IFUs for the Profemur® devices distributed in the United States that the use of any of its Profemur® modular necks was contraindicated in patients who engaged in heavy lifting.

110.    Wright Medical has never stated in its IFUs for the Profemur® devices distributed in the United States that the use of any of its modular necks was contraindicated in patients who engaged in impact sports.

111.    The IFU for Wright Medical Profemur® devices distributed in the United States was the same IFU document used for some other Wright Medical hip devices that did not use Profemur® Modular necks and were not modular at the region of the artificial femoral neck.

112.    At no time did Wright Medical state in its IFUs distributed in the United States that the rate of failure by fracture of the implant was higher for its Profemur® modular neck hip devices, compared to the rate of failure by fracture for other Wright Medical hip devices that did not use modular necks, but were subject to the same IFU document.

113.    Even though some Wright Medical IFUs for the Profemur® devices in use prior to August 2010, contained a section titled, "Conditions presenting increased risk of failure include. .

. ," that section of the IFU did not state that patients who weigh more than a certain patient body weight, or have a BMI at or above a certain number, or engage in a high level of physical activity, or engage in heavy lifting, or engage in impact sports, would be at an increased risk of failure (by fracture) of the modular neck component, when compared to the risk of failure for other Wright Medical hip devices using that same IFU document but that did not use modular necks.

114.   Even though some Wright IFUs for the Profemur® devices in use prior to August 2010, contained a section titled "Warning," and a subsection within titled "Modular Necks," Wright Medical did not state therein that patients weighing more than a certain patient body weight, or with a BMI at or above a certain number, or who engage in a high level of physical activity, or engage in heavy lifting, or engage in impact sports, would be at an increased risk of failure (by fracture) of the modular neck component when compared to the risk of failure (by fracture) for other Wright Medical hip devices using that same IFU document but that did not use modular necks.

115.   Even though some Wright IFUs for the Profemur® hip devices in use prior to August 2010, contained a section titled "General Product Information," that stated, "An overweight or obese patient can produce high loads on the prostheses, which can lead to failure of the prosthesis," and, "If the patient is involved in an occupation or activity which includes substantial walking, running, lifting, or muscle strain, the resultant forces can cause failure of the fixation of the device, or both," Wright Medical did not state that patients involved in an occupation or activity that included those activities created any higher risk of failure (by fracture) than would exist in any other design of artificial hip stems without a modular neck, when compared

to the risk of failure for other Wright Medical hip devices using that same IFU document but that did not use modular necks.

116.    Wright Medical did not change the language in its IFUs for its Profemur® devices distributed in the United States discussing the issue of any specific patient body weight or activity levels as they may relate to modular neck fractures until August 2010, if not later.

117.    Between the dates of December 13, 2000 and August 25, 2009 all of the Profemur® modular necks distributed by Wright Medical were made of a titanium alloy, generally known as Ti6Al4V.

118.    After Profemur® Modular Necks began to be implanted, Cremascoli and Wright Medical began to receive reports of its Profemur® titanium modular necks having fractured (i.e., broken into two pieces, as opposed to partially fractured, and still connected as one piece).

119.    After Profemur® Modular Necks began to be implanted, Cremascoli and Wright Medical began to receive reports of its Profemur® titanium modular necks having fractured (i.e., broken into two pieces) at the oblong taper (distal end) where it is seated in the "pocket" of the Profemur® stem.

120.    At some point in time prior to July 30, 2010, Wright Medical came to the conclusion that higher than normal rates of early failure of the long offset Profemur® titanium modular necks have been observed for heavyweight (>230 lbs.) patients.

121.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, case studies appeared in medical journals reporting the fracture of Wright Medical titanium Profemur® modular necks.

122.    Wright Medical titanium Profemur® Modular Necks were fracturing at the neck-stem junction because they were:

    a.   inadequately designed for the patient population for which they were marketed;

    b.   not designed to withstand the stress and loads that they would reasonably be expected to be subjected to after implantation;

    c.   not designed to meet the performance of applicable industry standards, particularly ISO 7206-6; and,

    d.   not designed with the performance characteristics that had been represented to surgeons by Wright Medical, and its sales force.

123.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, surgeons who had been implanting these devices began to question the safety of these devices.

124.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, some surgeons who had been implanting these devices stopped using the Wright Medical titanium modular necks.

125.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical's sales of its Profemur® hip devices in the United States began to decline.

126.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical did not acknowledge that modular neck fractures were a result of defective design.

127.     As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical engaged in a campaign of concealment, misinformation, deceit, and fraud, misrepresenting to surgeons the facts and truth as to the numbers, rates, and reasons for its Profemur® modular neck fractures.

128.     As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical did not inform all surgeons using these products that, based upon information that had been reported to the FDA MAUDE Database, the Long Profemur® Necks had the highest *number* of fractures of all of the titanium Profemur modular necks.

129.     As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical did not inform Plaintiff's surgeon that, based upon information that had been reported to the FDA MAUDE Database, the long Profemur® Modular Necks had the highest *number* of fractures of all of the Profemur modular necks.

130.     As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical began to design and develop a Profemur® modular neck made of a cobalt-chrome alloy [CoCr].

131.     One of the purposes of Wright Medical designing and developing a Profemur® modular neck made of CoCr was to preserve its market share of the artificial hip device market.

132.     On or about April 16, 2009, Wright Medical Technology, Inc. submitted to the FDA a 510(k) premarket notification of intent to market what it called "PROFEMUR® Hip System Modular Necks".  [See: FDA 510(k) K091423.]

133.    The modular necks that were the subject of the April 16, 2009, premarket notification of intent to market were made of a CoCr alloy.

134.    The modular necks that were the subject of the April 16, 2009, premarket notification of intent to market eventually became known as the Profemur® Plus CoCr Modular Neck.

135.    In that premarket notification Wright Medical represented to the FDA, "The indication of the use of the PROFEMUR® Hip System Modular Necks are identical to the previously cleared predicate devices. The design features and materials of the subject devices are substantially equivalent to those of the predicate devices." [See: FDA 510(k) K091423.]

136.    The "predicate devices" referenced in the April 16, 2009 notification of intent to market were the titanium Profemur® modular necks which had received clearance by way of the FDA letter dated December 13, 2003. [See: FDA 510(k) K003016.]

137.    The design, development, and introduction of Wright Medical Profemur® Plus CoCr Modular Necks was not done as a subsequent remedial measure for any design defect that existed in the Wright Medical titanium Profemur® modular necks.

138.    Prior to August 25, 2009, Wright Medical had been informed that the proposed Profemur® Plus CoCr Modular Necks would be subject to corrosion at the neck-stem junction.

139.    Prior to August 25, 2009, Wright Medical had been informed that the proposed Profemur® Plus CoCr Modular Necks would be subject to fracture at the neck-stem junction.

140.    Prior to August 25, 2009, Wright Medical had been advised not to proceed with the development, manufacture, and marketing of the proposed Profemur® Plus CoCr Modular Necks.

141.    Based upon what Wright Medical knew or should have known as of August 25, 2009, a reasonable manufacturer would not have marketed the Wright Medical Long Profemur® Plus CoCr modular necks.

142.    On August 25, 2009, Wright Medical received clearance from the FDA to market, in the United States Profemur® modular necks manufactured from CoCr.  [See: FDA 510(k) K091423.]

143.    Sometime after the date of August 25, 2009, Wright Medical began to market, distribute, and sell in the United States Profemur® Modular Necks made of a cobalt-chrome alloy.

144.    The Wright Medical Profemur® Plus CoCr Modular Necks were marketed to be an alternative for the Wright Medical titanium Profemur® Modular Necks, compatible with all of the same Wright Medical Profemur® stems and Wright Medical Conserve® femoral heads.

145.    Wright Medical does not admit that there was, or is, any defect in the design of its titanium Profemur® modular necks that leads to premature fracture of its titanium modular necks.

146.    Wright Medical does not admit that there was, or is, any defect in the manufacture of its titanium Profemur® modular necks that leads to premature fracture of its titanium modular necks.

147.    The Profemur® Plus CoCr Modular Necks that Wright Medical began to offer to surgeons and patients included versions that were long necks.

148.    The Profemur® Plus CoCr Modular Necks that Wright Medical began to offer to surgeons and patients did not include a warning that all of the titanium long Profemur® modular necks were reported to have fractured.

149.     The Profemur® Plus CoCr Modular Necks that Wright Medical began to offer to surgeons and patients did not include a warning that the CoCr version of the long Profemur® modular necks was the same length and angulation as the titanium versions of those necks, all of which were reported to be fracturing.

150.     The Profemur® Plus CoCr Modular Necks that Wright Medical designed and manufactured were designed to be used with all of the same femoral heads as were used with its titanium Profemur® modular necks.

151.     The Profemur® Plus CoCr Modular Necks that Wright Medical designed and manufactured were designed to be used with all of the same Profemur® hip stems as were used with its titanium Profemur® modular necks.

152.     In promoting its Profemur® Plus CoCr Modular Necks Wright Medical has stated, "Product complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for Profemur® Plus CoCr Modular Necks." [See Profemur® Plus CoCr Modular Necks Frequently Asked Questions, Wright Medical publication MH619-812.]

153.     The claim by Wright Medical in promoting its Profemur® Plus CoCr Modular Necks that, "Product complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for Profemur® Plus CoCr Modular Necks," was not supported by independent scientific testing.

154.     The claim by Wright Medical that "Product complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse

events due to taper junction fretting and corrosion or fractures for Profemur® Plus CoCr Modular Necks" was false and misleading.

155.    In marketing its Profemur® Plus CoCr Modular Necks Wright Medical claimed that these CoCr modular necks would result in less fretting than occurred with titanium modular necks.

156.    Claims by Wright Medical that these Profemur® Plus CoCr Modular Necks would result in less fretting than occurred with titanium modular necks was not supported by independent scientific testing.

157.    Claims by Wright Medical that its Profemur® Plus CoCr Modular Necks would result in less fretting than occurred with titanium modular necks were false and misleading.

158.    The design of the Wright Medical Profemur® Plus CoCr modular neck, when coupled with the design of the Wright Medical titanium Profemur® hip stem, is such that it in fact promotes the process of fretting corrosion at the modular neck/stem junction.

159.    The design of the Wright Medical Profemur® Plus CoCr modular neck, when coupled with the design of the Wright Medical titanium Profemur® hip stem, is such that it in fact promotes the process of fretting corrosion at the modular neck/stem junction, which leads to fractures of the modular neck in the pock of the stem.

160.    In promoting its Profemur® Plus CoCr Modular Necks Wright Medical claimed that the use of dissimilar metals, such as the mating of a CoCr modular neck with a titanium stem, would not result in galvanic corrosion ("battery effect") at a level that would be problematic for patients.

161.    Claims by Wright Medical that the mating of a Profemur® Plus CoCr Modular Neck with a titanium stem would not result in galvanic corrosion ("battery effect") at a level that would be problematic for patients, were not supported by unbiased sound scientific testing.

162.    Claims by Wright Medical that the mating of its Profemur® Plus CoCr Modular Necks with its Profemur® titanium stems, would not result in galvanic corrosion ("battery effect") at a level that would be problematic for patients, were false and misleading.

163.    The design of the Wright Medical Profemur® Plus CoCr modular neck, when coupled with the design of the Wright Medical titanium Profemur® hip stem is such that it in fact promotes the process of galvanic corrosion ("battery effect") at the modular neck/stem junction, which leads to fractures of the modular neck in the pocket of the stem.

164.    Prior to offering its Profemur® Plus CoCr Modular Necks for distribution or sale in the United States, Wright Medical did not adequately test its design of Profemur® Plus CoCr Modular Necks for fretting corrosion after implantation in patients.

165.    Prior to offering its Profemur® Plus CoCr Modular Necks for distribution or sale in the United States, Wright Medical did not adequately test its design of Profemur® Plus CoCr Modular Necks for galvanic corrosion ("battery effect") after implantation in patients.

166.    Prior to offering its Profemur® Plus CoCr Modular Necks for distribution or sale in the United States, Wright Medical did not adequately test its design of Profemur® Plus CoCr Modular Necks for fractures of the modular neck in the pocket of the stem after implantation in patients.

167.    Based upon what Wright Medical knew or should have known prior to going to market with its Profemur® Plus CoCr Modular Necks, Wright Medical should not have taken that product to market.

168.    Wright Medical took to market its Profemur® Plus CoCr Modular Necks without having adequately tested them for *in vivo* performance to resist fretting corrosion.

169.    Wright Medical took to market its Profemur® Plus CoCr Modular Necks without having adequately tested them for *in vivo* performance to resist galvanic corrosion.

170.    Wright Medical took to market its Profemur® Plus CoCr Modular Necks without having adequately tested them for *in vivo* performance to not fracture under normal and expected use.

171.    Wright Medical's motive in going to market with its Profemur® Plus CoCr Modular Necks was to preserve market share and its profits from the sale of its Profemur® hip products.

172.    The neck-stem junction of the Profemur® Plus CoCr Modular Neck, coupled with a Profemur® titanium hip stem, are subject to significant micromovement which results in significant fretting corrosion, galvanic corrosion, metal ion release, and fractures of the modular neck.

173.    The neck-stem junction of the Profemur® Plus CoCr Modular Neck, coupled with a Profemur® titanium hip stem, and the micromovement which results in significant fretting corrosion, galvanic corrosion, and metal ion release, directly and proximately causes adverse medical conditions which lead to the failure and need for revision of the patient's hip.

174.    Based upon what Wright Medical knew or should have known about the performance and durability of its Profemur® Plus CoCr Modular Necks, Wright Medical should not have placed those products on the market.

175.    Based upon what Wright Medical knew or should have known about the performance and durability of its Profemur® Plus CoCr Modular Necks, prior to June 14, 2010, Wright Medical should have taken those products off of the market.

176.    Based upon what Wright Medical knew or should have known about the performance and durability of its Profemur® Plus CoCr Modular Necks, prior to June 14, 2010, Wright Medical should have fully disclosed to surgeons the inadequacy of its testing, and the issues that the Profemur® Plus CoCr Modular Necks present to patients were substantially similar to the issues that the titanium Profemur® Modular Necks had presented.

177.    Prior to June 14, 2010, Wright Medical had been informed that its Profemur® Plus CoCr Modular Necks would be subject to corrosion at the neck-stem junction.

178.    Prior to June 14, 2010, Wright Medical had been informed that its Profemur® Plus CoCr Modular Necks would be subject to fracture at the neck-stem junction.

179.    C. Lowry Barnes, M.D., is an orthopedic surgeon who had for a time been a paid consultant for Wright Medical.

180.    C. Lowry Barnes, M.D., was a named contributor to or author of various Profemur® Surgical Techniques brochures for Wright Medical.

181.    At the request of Wright Medical, C. Lowry Barnes, M.D., participated in the design and development of the Wright Medical Profemur® Plus CoCr Modular Necks.

182.    C. Lowry Barnes, M.D., informed Wright Medical that its Profemur® Plus CoCr Modular Necks were corroding after implantation in patients.

183.    C. Lowry Barnes, M.D., informed Wright Medical that its Profemur® Plus CoCr Modular Necks were corroding after implantation in patients, resulting in the need for revision surgery to remove and replace the patient's implanted Profemur® hip system.

184.    C. Lowry Barnes, M.D., informed Wright Medical that its Profemur® Plus CoCr Modular Necks were defective.

185.    C. Lowry Barnes, M.D., informed Wright Medical that its Profemur® Plus CoCr Modular Necks should be removed from the market.

186.    Wright Medical ignored the recommendations of its paid consultant, C. Lowry Barnes, M.D., and continued to manufacture, distribute, and sell its Profemur® Plus CoCr Modular Necks for implantation in patients by orthopedic surgeons.

187.    Prior to June 19, 2013, Wright Medical began to receive notice from surgeons that its Profemur® Plus CoCr Modular Necks were corroding, resulting in the need for revision surgery to remove and replace the patient's implanted Profemur® hip system.

188.    Prior to June 19, 2013, Wright Medical received notice that there had been a fracture of a Profemur® Plus CoCr Modular Neck.

189.    On June 19, 2013, Wright Medical Group, Inc., the parent corporation of Wright Medical Technology, Inc., announced a definitive agreement under which MicroPort Medical B.V., a subsidiary of MicroPort Scientific Corporation, would acquire Wright's OrthoRecon business, including hip implant products.

190.    Upon information and belief, product complaint data reported to Wright Medical prior to January 9, 2014, did indicate an increased risk of adverse events due to taper junction fretting and corrosion for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems, as compared to traditional titanium necks.

191.    Upon information and belief, product complaint data reported to Wright Medical prior to January 9, 2014, did indicate an increased risk of adverse events due to galvanic corrosion ("battery effect"), as compared to traditional titanium necks when coupled with Wright Medical Profemur® hip stems.

192.    Prior to January 9, 2014, Wright Medical received notice that there had been fractures of Profemur® Plus CoCr Modular Necks.

193.    Wright Medical knew or should have known that as of the date of January 9, 2014:

    a.   it had not adequately tested its Profemur® Plus CoCr Modular Necks to simulate in vivo performance for resistance to fretting corrosion;

    b.   it had not adequately tested its Profemur® Plus CoCr Modular Necks to simulate in vivo performance for resistance to galvanic corrosion ("battery effect");

    c.   its Profemur® Plus CoCr Modular Necks would be subject to fretting corrosion;

    d.   there was an increased risk of fretting corrosion at the neck-stem junction;

    e.   there was an increased risk of galvanic corrosion ("battery effect") at the neck-stem junction; and,

    f.   there was an increased risk of fracture of the modular neck in the pocket of the stem.

194.    Based upon what Wright Medical knew or should have known as of January 9, 2014, a reasonable manufacturer would have ceased the distribution of the Wright Medical Profemur® Plus CoCr long modular necks prior to that date.

195.    Based upon what Wright Medical knew or should have known as of January 9, 2014, Wright Medical should have ceased the distribution of the Profemur® Plus CoCr Modular Necks prior to that date.

196.    Based upon what Wright Medical knew or should have known as of January 9, 2014, a reasonable manufacturer would have issued a recall of the Profemur® Plus CoCr Modular Necks prior to that date.

197.    Based upon what Wright Medical knew or should have known as of January 9, 2014, Wright Medical should have issued a recall of the Profemur® Plus CoCr Modular Necks prior to that date.

198.    Based upon what Wright Medical knew or should have known as of January 9, 2014, prior to that date a reasonable manufacturer would have published information that its claims that product complaint data did not indicate an increased risk of adverse events due to taper junction fretting and corrosion for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

199.    Based upon what Wright Medical knew or should have known as of January 9, 2014, prior to that date Wright Medical should have published information that its claims that product complaint data did not indicate an increased risk of adverse events due to taper junction fretting and corrosion for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

200.    Based upon what Wright Medical knew or should have known as of January 9, 2014, prior to that date a reasonable manufacturer would have published information that its claims that product complaint data did not indicate an increased risk of galvanic corrosion ("battery effect") for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

201.    Based upon what Wright Medical knew or should have known as of January 9, 2014, prior to that date Wright Medical should have published information that its claims that product complaint data did not indicate an increased risk of galvanic corrosion ("battery effect") for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

202.    Based upon what Wright Medical knew or should have known as of January 9, 2014, prior to that date a reasonable manufacturer would have informed orthopedic surgeons using its Profemur® hip products that its claims that product complaint data did not indicate an increased risk of galvanic corrosion ("battery effect") for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

203.    Based upon what Wright Medical knew or should have known as of January 9, 2014, prior to that date Wright Medical should have informed orthopedic surgeons using its Profemur® hip products that its claims that product complaint data did not indicate an increased risk of galvanic corrosion ("battery effect") for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

204.    Based upon what Wright Medical knew or should have known as of January 9, 2014, prior to that date Wright Medical should have informed orthopedic surgeons using its Profemur® hip products that its claims that product complaint data indicated that Wright Medical Profemur® Plus CoCr Modular Necks were fracturing in the pocket of the stem.

205.    Based upon what Wright Medical knew or should have known as of January 9, 2014, a reasonable manufacturer would have provided post-sale warnings to surgeons who had implanted its Wright Medical Profemur® Plus CoCr modular necks prior to that date that there was an increased risk of adverse events due to taper junction fretting and corrosion for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems.

206.    Based upon what Wright Medical knew or should have known as of January 9, 2014, a reasonable manufacturer would have provided post-sale warnings to patients who had implanted in them its Wright Medical Profemur® Plus CoCr modular necks that there was an increased risk of adverse events due to taper junction fretting and corrosion for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems.

207.    On or about January 9, 2014, Wright Medical Group, Inc., the parent corporation of Wright Medical Technology, Inc., MicroPort Medical B.V., a subsidiary of MicroPort Scientific Corporation, acquired Wright's OrthoRecon business, including the Profemur® hip implant products.

208.    On or about January 9, 2014, the Wright Medical OrthoRecon operating segment, was sold for approximately $285 million to "MicroPort.".

209.    The neck-stem junctions of the Profemur® Plus CoCr Modular Necks, coupled with Profemur® titanium hip stems, are subject to significant micromovement which result in significant

fretting corrosion, galvanic corrosion, metal ion release, and fracture of the modular neck in the pocket of the stem.

210.     The neck-stem junctions of the Profemur® Plus CoCr Modular Necks, coupled with Profemur® titanium hip stems, and the micromovement which results in significant fretting corrosion, galvanic corrosion, and metal ion release, directly and proximately causes adverse medical conditions which lead to the failure, fracture of the neck, and need for revision of the hip.

211.     Based upon the facts and allegations set forth above, the Profemur® Plus CoCr modular necks are defective in their design in that the risks that were inherent in this product being used for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have been gained by placing this defective product in the body of Plaintiff Robert Rembisz.

212.     Based upon the facts and allegations set forth above, the Profemur® Plus CoCr Modular Necks are defective in their manufacturing in that they do not comply with their intended design, specifications, in that the risks that were inherent in this product being used for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have been gained by placing this defective product in the body of Plaintiff Robert Rembisz.

213.     Based upon the facts and allegations set forth above, the Profemur® Plus CoCr Modular Necks are defective in their labeling in that they do not perform as represented, and the risks that were inherent in this product being used for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have been gained by placing this defective product in the body of Plaintiff Robert Rembisz.

214.    Based upon the facts and allegations set forth above, the Profemur® Plus CoCr Modular Necks are unreasonably dangerous in that the risks that were inherent in this product being used for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have been gained by placing this defective product in the body of Plaintiff Robert Rembisz.

215.    Defendant Wright Medical Technology, Inc. was negligent in its design, manufacture, distribution and sale, marketing, promotion, and labeling of the Profemur® Plus CoCr Modular Necks.

216.    Defendant Wright Medical Technology, Inc. was negligent in its failure to warn patients or surgeons that it had received data that did indicate an increased risk of adverse events due to taper junction fretting and corrosion.

217.    Defendant Wright Medical Technology, Inc. was negligent in its failure to warn patients or surgeons that it had received data that did indicate an increased risk of adverse events due to galvanic corrosion ("battery effect").

218.    On August 7, 2015, MicroPort initiated a Class 1 Voluntary Device Product Recall for its Profemur® Plus CoCr Modular Neck PHAC-1254.

219.    Class 1 recalls are the most serious type of recall and involve situations in which there is a reasonable probability that use of these products will cause serious adverse health consequences or death.

220.    MicroPort sent a letter dated August 7, 2015, via FedEx, to all affected customers, wherein they were informed of a voluntary hip replacement recall by MicroPort Orthopedics Inc.;

surgeons, managers, distributors, and hospitals were instructed to cease distributing and using the Profemur® Plus CoCr Modular Neck PHAC-1254, for hip replacement surgeries.

221.    By letter dated August 7, 2015, MicroPort Orthopedics Inc. informed distributors and hospital staff of a voluntary device product recall.  Distributors and hospital staff, including risk managers and surgeons, were instructed to stop using and distributing the affected product, and return the recalled product to MicroPort Orthopedics Inc. Distribution Center at 11481 Gulf Stream, Arlington, Tennessee 38002.

222.    On September 28, 2015, the Class 1 Device Recall of the Profemur Plus CoCr Modular Neck PHAC-1254 was "posted" by the FDA on its website.

223.    On July 31, 2020, MicroPort initiated a Class 2 Voluntary Device Product Recall of all other versions of the "Profemur Titanium and Cobalt Chrome modular necks."

224.    On September 9, 2020, the Class 2 Device Recall of all other versions of the Profemur Titanium and Cobalt Chrome modular necks was "posted" by the FDA on its website.

## WARRANTIES

### Profemur® Plus CoCr Modular Necks

225.    By Florida law certain implied warranties of merchantability and fitness for intended use are applicable to the Profemur® Plus CoCr Modular Necks.

226.    Statements and representations made by Defendant Wright Medical, as set forth in this Complaint, constitute express warranties as to the performance, durability, and capabilities of the Profemur® Plus CoCr Modular Necks.

227.    The micromotion, fretting corrosion, galvanic corrosion, and fracture of Plaintiff Robert Rembisz's Profemur® Plus CoCr Modular Neck, also was a breach of the applicable express warranties of Defendant Wright Medical.

228.    The failure of Plaintiff Robert Rembisz's Profemur® Plus CoCr Modular Neck was a breach of the applicable express warranties of Defendant Wright Medical.

229.    The micromotion, fretting corrosion, galvanic corrosion, and fracture of Plaintiff Robert Rembisz's Profemur® Plus CoCr Modular Neck was a breach of the applicable implied warranties of merchantability and fitness for intended use by Defendant Wright Medical.

230.    The failure of Plaintiff Robert Rembisz's Profemur® Plus CoCr Modular Neck was a breach of the applicable implied warranties of merchantability and fitness for intended use by Defendant Wright Medical.

## ALLEGATIONS OF DEFECTIVE PRODUCT

231.    The Profemur® Plus CoCr Modular Neck is designed in a way that after implantation in a patient it is subject to micromotion and fretting corrosion at a point of high loading and stress, thereby increasing the potential for structural failure due to fatigue failure and fracture of the oblong taper at the distal end of the modular neck at or near the neck-stem junction.

232.    The Profemur® Plus CoCr Modular Neck is manufactured in a way that after implantation in a patient it is subject to micromotion and fretting corrosion at a point of high loading and stress, thereby increasing the potential for structural failure due to fatigue failure and fracture of the oblong taper at the distal end of the modular neck, at or near the neck-stem junction.

233.    The Profemur® Plus CoCr Modular Neck is designed in a way that after implantation in a patient it is subject to structural failure due to fatigue failure and fracture of the

oblong taper at the distal end of the modular neck at or near the neck-stem junction as a result of being subjected to the normal and expected activities of daily living.

234.    The Profemur® Plus CoCr Modular Neck implanted in Plaintiff Robert Rembisz, was not merchantable, and was unreasonably dangerous for its intended and/or reasonably foreseeable uses in that:

    a.  it was and is unreasonably dangerous under Florida product liability law as a result of one or more of a combination of the following:

        1.  the Profemur® Plus CoCr Modular Neck was designed in such a way that the point of highest stress on the modular neck is at the neck-stem junction;

        2.  the Profemur® Plus CoCr Modular Neck was designed in such a way that the modular neck was subject to micromotion and fretting corrosion at its point of highest stress, thereby increasing the potential for failure by fatigue fracture;

        3.  the surface of the section of the Profemur® Plus CoCr Modular Neck that was inserted into the femoral stem was designed in such a manner as to increase the potential for fretting and corrosion and failure;

        4.  the portion of the Profemur® Plus CoCr Modular Neck that was inserted in the femoral stem was in a narrow, confined space, thereby increasing the potential for fretting, corrosion, and failure;

        5.  the Profemur® Plus CoCr Modular Neck was designed in such a way as to make the modular neck component more susceptible to fretting and

corrosion than other existing alternative products, thereby increasing the potential for failure;

6. the Profemur® Plus CoCr Modular Neck was designed in such a way as to make the modular neck component more susceptible to fatigue failure and fractures than other existing alternative products;

7. the risk of neck fracture outweighed the utility of the Profemur® Plus CoCr Modular Neck, considering other technically feasible alternatives, and other already existing alternative products;

8. a reasonably prudent manufacturer or seller, given knowledge of the Profemur® Plus CoCr Modular Neck's performance and condition, would not have marketed, or sold the product; and,

9. there may be other conditions or defects yet to be determined.

b. It was dangerous to an extent beyond which would be contemplated by the ordinary consumer with the ordinary knowledge common to the community as to its characteristics in that:

1. the ordinary consumer would not contemplate that the ordinary activities of daily living would result in the catastrophic structural failure of the Profemur® Plus CoCr Modular Neck;

2. the ordinary consumer would not contemplate that the Profemur® Plus CoCr Modular Neck would catastrophically structurally fail as a result of being used in the manner and for activity levels that Wright Medical intended; and,

3. the ordinary consumer would not contemplate that the Profemur® Plus CoCr Modular Neck would catastrophically structurally fail as a result of being used in the manner and for activity levels that Wright Medical posted on its website as "Patient Testimonials" and "Patient Stories".

235.   The Profemur® Plus CoCr Modular Neck is not designed to withstand the normal activities of daily living after implantation without catastrophic structural failure of the Profemur® Plus CoCr Modular Neck from a fatigue fracture during the expected useful life of that component.

236.   The Profemur® Plus CoCr Modular Neck is not designed to withstand the normal activities of daily living after implantation in "heavyweight" patients, as Wright Medical defined and used that term, without catastrophic structural failure of the Profemur® Plus CoCr Modular Neck from a fatigue fracture during the expected useful life of that component.

237.   The Profemur® Plus CoCr Modular Neck is not designed to withstand the activities of "high impact sports," as Wright Medical defined and used that term, without catastrophic structural failure of the Profemur® Plus CoCr Modular Neck from a fatigue fracture during the expected useful life of that component.

238.   The Profemur® Plus CoCr Modular Neck is not designed to withstand the activities of patients "involved in an occupation or activity which includes substantial walking, running, lifting, or muscle straining," as Wright Medical defined and used those terms, without catastrophic structural failure of the Profemur® Plus CoCr Modular Neck from a fatigue fracture during the expected useful life of that component.

239.   The Profemur® Plus CoCr Modular Neck was not designed to withstand the forces that were known would be encountered in the normal activities of daily living for all of the patient

population that the product was intended for, without catastrophic structural failure of the Profemur® Plus CoCr Modular Neck from a fatigue fracture during the expected useful life of that component.

240.     The Profemur® Plus CoCr Modular Neck was not designed to withstand the forces that were known would be encountered in the normal activities of daily living for all of the patient population that the product was marketed for, without catastrophic structural failure of the Profemur® Plus CoCr Modular Neck from a fatigue fracture during the expected useful life of that component.

241.     The Profemur® Plus CoCr Modular Neck was not designed to withstand the forces that were known would be encountered in the normal activities of daily living, without catastrophic structural failure of the Profemur® Plus CoCr Modular Neck from a fatigue fracture during the expected useful life of that component, for some of the people who appeared on Wright Medical's website "Patient Testimonials" and "Patient Stories" web pages.

242.     Wright Medical marketed and promoted its Profemur® Plus CoCr Modular Neck as appropriate for persons who wanted to return to an active lifestyle, which was a material consideration by Plaintiff's surgeon in recommending the Profemur® hip system for implantation in Plaintiff Robert Rembisz.

243.     Wright Medical marketed and promoted its Profemur® Plus CoCr Modular Neck as appropriate for persons who wanted to return to an active lifestyle, which was a material consideration by Plaintiff's surgeon in choosing the Profemur® Hip System for implantation in Plaintiff Robert Rembisz.

244.     Wright Medical marketed and promoted its Profemur® Plus CoCr Modular Neck as appropriate for persons who wanted to return to an active lifestyle, which was a material consideration by Plaintiff Robert Rembisz in choosing to have artificial hip surgery.

245.     Wright Medical marketed and promoted its Profemur® Plus CoCr Modular Neck as appropriate for persons who wanted to return to an active lifestyle, which was a material consideration by Plaintiff Robert Rembisz in agreeing to have Dr. Fowble implant the Profemur® Hip System in him.

246.     The Profemur® Plus CoCr Modular Neck was not tested in design and development at the level of forces that would be equivalent to the forces it would be subjected to in the activities of living in the patient population that Wright Medical marketed these devices for use in.

247.     The Profemur® Plus CoCr Modular Neck was not tested in design and development at the level of forces that would be equivalent to the forces it would be subjected to in the normal activities of daily living of "heavyweight" patients, as Wright Medical defined and used that term.

248.     The Profemur® Plus CoCr Modular Neck was not tested in design and development at the level of forces that would be equivalent to the forces it would be subjected to in the reasonably expected activities of patients who engaged in "high impact sports," as Wright defined and used that term.

249.     The Profemur® Plus CoCr Modular Neck was not tested in design and at the level of forces that would be equivalent to the forces it would be subjected to in the reasonably expected activities of patients "involved in an occupation or activity which includes substantial walking, running, lifting, or muscle straining," as Wright defined and used those terms.

## ALLEGATIONS OF WRIGHT MEDICAL'S CONDUCT

250.    The Profemur® Plus CoCr Modular Neck is of a design that it will corrode at the neck stem junction when being used in accordance with the levels of activity and used by the patient population that it was marketed for by Wright Medical.

251.    The Profemur® Plus CoCr Modular Neck is of a design that it may suddenly and catastrophically fail when being used in accordance with the levels of activity and used by the patient population that it was marketed for by Wright Medical.

252.    The Profemur® Plus CoCr Modular Neck is of a design that it may structurally fail by suddenly breaking into two pieces, often without any prior symptoms, notice or warning of impending failure.

253.    The Profemur® Plus CoCr Modular Neck is of a design that it will structurally fail by suddenly breaking into two pieces, often without any prior symptoms, notice or warning of impending failure, when being used in reasonable and foreseeable ways.

254.    The Wright Medical hip system with the Profemur® Plus CoCr Modular Neck was marketed by Wright Medical and the sales and marketing representatives Wright Medical trained, for uses and durability that exceeded its design and its structural limitations known to Wright Medical.

255.    The Profemur® Plus CoCr Modular Neck was marketed by Wright Medical and its trained representatives for uses and durability that exceeded their design, capabilities, and limitations as stated in the IFUs that Wright Medical published for these devices.

256.    Prior to the date of implant in Plaintiff Robert Rembisz Wright Medical did not warn patients, surgeons, hospitals, customers, distributors, or the sales representatives it trained,

that the femoral necks of its Profemur Hip System were fracturing at a rate higher than other comparable artificial hip systems readily on the market that did not employ a titanium modular neck design at the point of the femoral neck-stem junction.

257.    The Wright Medical hip system with the Profemur® Plus CoCr Modular Neck is designed, manufactured, labeled, marketed, and promoted in such a way that it has a substantially higher rate of failure by corrosion at the neck-stem junction than other comparable devices readily available on the market.

258.    The Wright Medical hip system with the Profemur® Plus CoCr Modular Neck is designed, manufactured, labeled, marketed, and promoted in such a way that it has a substantially higher rate of structure failure by modular neck fracture than other comparable devices readily available on the market.

## WANTON, WILLFUL, RECKLESS AND GROSSLY NEGLIGENT CONDUCT

259.    Considering all of the facts, as alleged above, going to market with the Profemur® Plus CoCr Modular Necks is clear and convincing evidence of wanton, willful, reckless, and grossly negligent conduct, and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

260.    The failure of Defendant Wright Medical Technology, Inc., to cease the distribution of the Profemur® Plus CoCr Modular Necks before the date of June 14, 2010, is clear and convincing evidence of wanton, willful, reckless, and grossly negligent conduct, and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

261.    The failure of Defendant Wright Medical Technology, Inc., to warn patients or surgeons that it had received data that did indicate an increased risk of fracture with the Profemur®

Plus CoCr Modular Neck and adverse events due to taper junction fretting and corrosion, is clear and convincing evidence of wanton, willful, reckless, and grossly negligent conduct, and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

262.    The failure of Defendant Wright Medical Technology, Inc., to provide post-sale warnings to patients or surgeons that it had received data that did indicate an increased risk of fracture with the Profemur® Plus CoCr Modular Neck and adverse events due to taper junction fretting and corrosion, is clear and convincing evidence of wanton, willful, reckless, and grossly negligent conduct, and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

263.    The failure of Defendant Wright Medical Technology, Inc., to cease the distribution of the Profemur® Plus CoCr Modular Necks before the date of January 9, 2014, is clear and convincing evidence of Wright Medical's continuing wanton, willful, reckless, and grossly negligent conduct, and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

264.    The failure of Defendant Wright Medical Technology, Inc., to recall Profemur® Plus CoCr Modular Necks is clear and convincing evidence of continuing wanton, willful, reckless, and grossly negligent conduct, and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

265.    The failure of Defendant Wright Medical Technology, Inc., to heed the advice of its paid consultant, C. Lowry Barnes, M.D., to cease the distribution of the Profemur® Plus CoCr Modular Necks, but to continue to market those devices for implantation by surgeons in patients, is clear and convincing evidence of its continuing wanton, willful, reckless, and grossly negligent

conduct, and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

266.    The failure of Defendant Wright Medical Technology, Inc., to disclose to MicroPort, prior to its purchase of the Profemur® product line on January 9, 2014, the truthful and accurate history of the information and advice it had received about the defects in the Profemur® Plus CoCr Modular Necks, and the risk those products posed to patients, and the fractures that were occurring in the Profemur® Plus CoCr Modular Necks, is clear and convincing evidence of its continuing wanton, willful, reckless, and grossly negligent conduct, and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

267.    The conduct of Ted Davis, the President of the Wright Medical OrthoRecon operating segment, before he became the President and CEO of MicroPort, in allowing Wright Medical to continue to provide to surgeons for implantation in patients the Profemur® Plus CoCr Modular Necks, knowing the truthful and accurate history of the information and advice it had received about the defects in the Profemur® Plus CoCr Modular Necks, and the risk those products posed to patients, and the fractures that were occurring in the Profemur® Plus CoCr Modular Necks, is clear and convincing evidence of Wright Medical's continuing wanton, willful, reckless, and grossly negligent conduct, and demonstrates a complete indifference to, and a conscious disregard for the safety of patients on the part of Wright Medical, before the sale of Wright Medical's OrthoRecon operating segment to MicroPort.

## PLAINTIFF'S INJURIES AND DAMAGES

268.    Due to micromotion and fretting corrosion of the oblong taper of the Profemur® Plus CoCr Modular Neck where it seated in the pocket of the stem, the Profemur® Plus CoCr

Modular Neck implanted in Plaintiff Robert Rembisz's right hip corroded, causing physical injury to Plaintiff.

269.    As a direct and proximate result of the conduct of Defendant Wright Medical Technology, Inc., as set forth in this Complaint, Plaintiff Robert Rembisz sustained injuries and damages including, but not limited to, pain, suffering, disability, and physical impairment, as well as neurologic symptoms including peripheral neuropathy, tinnitus, balance/coordination issues, a heal fracture as a direct result of those balance/coordination issues, and B12 deficiency.

270.    As a direct and proximate result of the conduct of Defendant Wright Medical Technology, Inc., as set forth in this Complaint, Plaintiff Robert Rembisz sustained injuries and damages including, undergoing surgery to remove and replace his failed Profemur® Plus CoCr Modular Neck device; past and future pain and anguish, both in mind and in body; permanent diminishment of his ability to participate in and enjoy the affairs of life; medical bills associated with the replacement procedure and recovery therefrom; future medical expenses; loss of enjoyment of life; disfigurement; physical impairment, and other injuries not fully known at this time.

271.    Plaintiff Robert Rembisz's injuries suffered were both factually and proximately caused by the defective Profemur® Plus CoCr Modular Neck of Defendant Wright Medical Technology, Inc.

272.    Plaintiff Robert Rembisz's injuries suffered were both factually and proximately caused by the unreasonably dangerous Profemur® Plus CoCr Modular Neck product of Defendant Wright Medical Technology, Inc.

273.    Plaintiff Robert Rembisz's injuries suffered were both factually and proximately caused by the unreasonably dangerous Profemur® Plus CoCr Modular Neck product of Defendant Wright Medical.

274.    Plaintiff Robert Rembisz is entitled to recover for all economic and special damages incurred, including but not limited to damages for his June 28, 2021, revision surgery, rehabilitative services, follow up doctor visits and all expenditures incurred as a result of the additional operation and follow up procedure.

275.    Plaintiff Robert Rembisz is entitled to compensation for permanent disability as a result of the failure of the Profemur® Plus CoCr Modular Neck device which caused substantial injury.

276.    Plaintiff Robert Rembisz further shows that he is entitled to recover for all noneconomic and compensatory damages allowed by law, including, but not limited to, pain and suffering that he has incurred as a result of the defective Profemur® Plus CoCr Modular Neck, the June 28, 2021, revision surgery, rehabilitation, and constant pain that occurs as a result of the failure of the product.

277.    As a direct and proximate result of the failure of Plaintiff's Profemur® Plus CoCr Modular Neck, Plaintiff Robert Rembisz has sustained injuries and damages including, but not limited to:

        a.   undergoing a revision surgery on June 28, 2021, to remove and replace the failed Profemur® Plus CoCr Modular Neck;

        b.   past and future pain and anguish, both in mind and in body;

c.   permanent diminishment of his ability to participate in and enjoy the affairs of life;

d.   medical bills and expenses in excess of $75,000 associated with the June 28, 2021, revision surgery procedure and recovery therefrom;

e.   the risk of future failure by fracture of the [now recalled] Titanium Profemur Modular Neck that was implanted in the June 28, 2021 revision surgery.

f.   future medical expenses;

g.   loss of enjoyment of life;

h.   disfigurement; and,

i.   physical impairment.

278.   As a direct and proximate result of the failure of Plaintiff's Profemur® Plus CoCr Modular Neck, Plaintiff Cheryl C. Rembisz has suffered the loss of consortium of her husband, Robert Rembisz.

## CAUSES OF ACTION

## STRICT LIABILITY

279.   Plaintiffs incorporate by reference the above paragraphs 1 through 276 of this Complaint, as if fully set forth herein.

280.   Defendant Wright Medical was the "manufacturer" of the subject Profemur® Plus CoCr Modular Neck, and the other Profemur® and Conserve® products implanted in Plaintiff, as the term "manufacturer" is defined under applicable Florida law.

281.    Defendant Wright Medical was the "seller" of the subject Profemur® Plus CoCr Modular Neck, and the other Profemur® and Conserve® products implanted in Plaintiff, as the term "seller" is defined under applicable Florida law.

282.    At the time of Plaintiff's injuries, Defendant Wright Medical's Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, were defective and unreasonably dangerous for use by foreseeable consumers, including Plaintiff.

283.    Defendant Wright Medical's Profemur® Plus CoCr Modular Neck, and the Profemur® Hip System, implanted in Plaintiff were in the same or substantially similar condition as when it left the possession of Defendant Wright Medical.

284.    Plaintiff did not misuse or materially alter the Wright Medical's Profemur® Plus CoCr Modular Neck, or the Profemur® Hip System, implanted in him.

285.    The Profemur® Plus CoCr Modular Neck, and the Profemur® Hip System, did not perform as safely as an ordinary consumer would have expected them to perform when used in a reasonably foreseeable way.

286.    A reasonably prudent person would conclude that:

a.    The Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, designed, manufactured, sold, and supplied by Defendant Wright Medical were defectively designed and placed into the stream of commerce in a defective and unreasonably dangerous condition for consumers;

b.    The seriousness of the potential injuries resulting from these products drastically outweighs any benefit that could be derived from its normal,

        intended use, compared to other available products that perform the same function;

  c.  Defendant Wright Medical failed to properly market, design, manufacture, distribute, supply, and sell the Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, despite having extensive knowledge that the aforementioned injuries could and did occur;

  d.  Defendant Wright Medical failed to warn and place adequate warnings and instructions on the Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System;

  e.  Defendant Wright Medical failed to adequately test the Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System; and,

  f.  Defendant Wright Medical failed to market an economically feasible alternative design, despite the existence of the economical, safer alternatives, that could have prevented Plaintiff's injuries and damages.

287.    The subject Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, were in a defective condition or unreasonably dangerous at the time they left the control of the manufacturer or seller.

288.    The subject Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, were in a defective condition based on the state of scientific and technological knowledge available to the manufacturer or seller at the time the product was placed on the market.

289.    The subject Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, were in a defective condition in that they were in a condition that rendered them unsafe for normal or anticipatable use.

290.    The subject Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, were unreasonably dangerous in that they were dangerous to an extent beyond that which would be contemplated by the ordinary consumer who received them, with the ordinary knowledge common to the community as to its characteristics.

291.    The subject Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, were unreasonably dangerous in that these products, because of their dangerous condition, would not have been put on the market by a reasonably prudent manufacturer or seller.

292.    The subject Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, were not subject to subsequent unforeseeable alteration, change, improper maintenance, or abnormal use after it left the control of the manufacturer.

293.    At the time the subject Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, were put on the market, the manufacturer or seller, Wright Medical, knew of their dangerous condition.

294.    Defendant Wright Medical's actions and omissions were the direct and proximate cause of Plaintiff's injuries and damages.

295.    Defendant Wright Medical's conduct, as described above, was extreme and outrageous.

296.    Defendant Wright Medical risked the safety and well-being of the consumers and users of its Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, including

Plaintiff, with the knowledge of the safety and efficacy problems and suppressed this knowledge from the public.

297.    Defendant Wright Medical made the conscious decision not to timely recall the subject Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System.

298.    As a direct and proximate result of the conduct, actions, inactions, and knowledge of Defendant Wright Medical, as set forth above, Defendant Wright Medical is strictly liable for Plaintiff Robert Rembisz's injuries and damages, as set forth in this Complaint, under applicable Florida law.

299.    As a direct and proximate result of the conduct, actions, inactions, and knowledge of Defendant Wright Medical, as set forth above, Plaintiff Cheryl C. Rembisz has suffered the loss of consortium of her husband, Robert Rembisz.

## GENERAL NEGLIGENCE

300.    Plaintiffs incorporate by reference the above paragraphs 1 through 276 of this Complaint, as if fully set forth herein.

301.    Defendant Wright Medical was the designer, manufacturer, importer, distributor, marketer, seller, and supplier of the subject Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System.

302.    Defendant Wright Medical had a duty of a reasonably prudent person, a duty of reasonable care, to design, test, label, market, distribute, and sell its Profemur® Plus CoCr Modular Necks and the Profemur® Hip System products that were not defective and were reasonably safe for their intended uses by consumers, such as Plaintiff.

303.    Defendant Wright Medical failed to exercise ordinary and reasonable care in designing, testing, selling, distributing, labeling, marketing, and promoting its Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, products, which were defective and presented an unreasonable risk of harm to consumers, such as Plaintiff.

304.    Defendant Wright Medical failed to exercise ordinary and care in the design, distribution, advertising, promotion, marketing, and sale of its Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, products in that Defendant Wright Medical knew or should have known that these products presented an unreasonable risk of harm to Plaintiff and consumers alike.

305.    Defendant Wright Medical had a duty to:

a.    Warn consumers that it knew its Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, were at an increased risk of corrosion at the junctions;

b.    Warn consumers that it knew its Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, were at an increased risk of corrosion at the junctions, compared to other similar products available at that time;

c.    It had not adequately tested its Profemur® Plus CoCr Modular Necks to simulate in vivo performance for resistance to fretting corrosion;

d.    It had not adequately tested its Profemur® Plus CoCr Modular Necks to simulate in vivo performance for resistance to galvanic corrosion ("battery effect"); its Profemur® Plus CoCr Modular Necks would be subject to fretting corrosion;

e.    There was an increased risk of fretting corrosion at the neck-stem junction;

f.  There was an increased risk of galvanic corrosion ("battery effect") at the neck-stem junction; and,

g.  There was an increased risk of fracture of the modular neck in the pocket of the stem.

306.  Defendant Wright Medical was negligent in the design, manufacture, warning, marketing, distribution, and sale of its Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System products in that, among other things, it:

a.  Failed to use ordinary and reasonable care in designing these, products;

b.  Failed to use ordinary and reasonable care in the marketing of these Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, products;

c.  After Defendant Wright Medical knew or should have known that the Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System products, were corroding, failing, and were defective, it continued to manufacture, market, sell, and distribute these products for human implantation;

d.  After Defendant Wright Medical knew or should have known that the Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System products, were corroding, failing, and were defective, it failed to provide post-sale warnings to surgeons or people who had these devices implanted in their hips;

e.  After Defendant Wright Medical knew or should have known that its Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, products were corroding, failing, and were defective, it did not recall these products;

f.  Placed an unsafe product into the stream of commerce; and,

58

g. Promoted and marketed its Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, products with false and misleading statements regarding their clinical history and performance.

307.    As a direct and proximate result of the negligence of Defendant Wright Medical, Plaintiff's Profemur® Plus CoCr Modular Neck, and the Profemur® Hip System caused injury to Plaintiff as set forth elsewhere in this Complaint.

308.    Defendant Wright Medical risked the safety and well-being of the consumers and users of its Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, including Plaintiff, with the knowledge of the safety and efficacy issues these products had, and withheld this knowledge from the public.

309.    Defendant Wright Medical made the conscious decision not to timely redesign its Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System, despite the existence of economically feasible, safer alternative designs, warn or inform the unsuspecting consuming public.

310.    Defendant Wright Medical made the conscious decision not to timely recall the defective Profemur® Plus CoCr Modular Necks, and the Profemur® Hip System.

311.    At the time in which the subject Profemur® Plus CoCr Modular Neck, and the Profemur® Hip System, was purchased by Plaintiff, up through the time Plaintiff was injured, Defendant Wright Medical knew or had reason to know that these products were dangerous and created an unreasonable risk of harm to consumers.

312.    Defendant Wright Medical risked the safety and well-being of the consumers and users of its Profemur® Plus CoCr Modular Neck, and the Profemur® Hip System, including

Plaintiff, with the knowledge of the safety and efficacy problems and suppressed this knowledge from the public.

313.    Defendant Wright Medical had a duty to exercise reasonable care in the design, manufacture, testing, quality assurance, quality control, labeling, warning, marketing, promotion, importation, sale, and distribution of the Profemur® Plus CoCr Modular Neck.

314.    Defendant Wright Medical failed to exercise ordinary care, and was negligent in the design, formulation, manufacture, importation, sale, testing, quality assurance, quality control, labeling, warning, marketing, promotion, and distribution of the Profemur® Plus CoCr Modular Neck in that Defendant Wright Medical knew or should have known the facts alleged and set forth above in this Complaint.

315.    Defendant Wright Medical additionally failed to exercise ordinary care and was negligent in testing and failing to adequately test the Profemur® Plus CoCr Modular Necks prior to its marketing, importation, sale, and distribution.

316.    Had Defendant Wright Medical adequately tested its Profemur® Plus CoCr Modular Necks it would have discovered that they were subject to fretting corrosion, similar to the titanium versions of the Profemur® Modular Necks.

317.    Had Defendant Wright Medical adequately tested its Profemur® Plus CoCr Modular Necks it would have discovered that they were subject to fracture in the pocket of the stem, similar to the titanium versions of the Profemur® Modular Necks.

318.    Had Defendant Wright Medical adequately tested its Profemur® Plus CoCr Modular Necks it would have discovered that they were certain not to withstand over time without

fracture the forces that they would be subjected to in the ordinary activities of some patients that these devices were reasonably expected to be implanted in.

319.     Defendant Wright Medical was negligent in failing specifically to warn implanting surgeons, such as Vincent Fowble, M.D. that the Profemur® Plus CoCr Modular Neck should not be used for active patients.

320.     Defendant Wright Medical was negligent in failing to warn Plaintiff Robert Rembisz and his surgeon, that after the hip replacement that there was an increased risk the Profemur® Plus CoCr Modular Neck would corrode, and fracture from metal fatigue, during normal and expected use as compared to the risk of fracture at the femoral neck of other artificial hip systems that did not use a modular neck with a neck-stem joint at a similar location.

321.     Defendant Wright Medical knew or had reason to know that Plaintiff Robert Rembisz, as a member of the general public for whose use the device was placed into interstate commerce, would be likely to use the device in a manner described in this Complaint.

322.     Defendant Wright Medical knew or reasonably should have known of the danger associated with the manner and circumstances of Plaintiff Robert Rembisz's foreseeable use of the Profemur® Plus CoCr Modular Neck, which dangers would not be obvious to the general public.

323.     Despite the fact that Defendant Wright Medical knew or should have known that the Profemur® Plus CoCr Modular Neck posed a serious risk of bodily harm to consumers, Defendant Wright Medical negligently placed this product on the market.

324.     Despite the fact that Defendant Wright Medical knew or should have known that the Profemur® Plus CoCr Modular Neck posed a serious risk of bodily harm to consumers,

Defendant Wright Medical negligently continued to manufacture and market these devices for use by consumers.

325.    Defendant Wright Medical knew or should have known that consumers such as Plaintiff Robert Rembisz would foreseeably suffer injury as a result of its negligence and failure to exercise ordinary care as described above.

326.    Defendant Wright Medical's conduct, as described above and throughout this Complaint, including, but not limited to, Defendant's inadequate design, failure to adequately test, failure to warn, misrepresentations, and false statements, as well as its continued marketing and distribution of Profemur® Plus CoCr Modular Neck, when it knew or should have known of the serious health risks these devices created and/or the failure to comply with federal reporting and labeling requirements, was negligent.

327.    As a direct and proximate result of Defendant Wright Medical's negligence, failure to exercise ordinary care, and other tortious and wrongful conduct as set forth herein, Plaintiff Robert Rembisz has suffered injuries and damages.

328.    Defendant Wright Medical's conduct, as described above, was negligent, grossly negligent, reckless, intentional, extreme, and outrageous.

329.    As a direct and proximate result of the negligence, conduct, actions, inactions, and knowledge of Defendant Wright Medical, as set forth above, Defendant Wright Medical is liable for Plaintiff's injuries and damages, as set forth in this Complaint.

330.    As a direct and proximate result of the negligence, conduct, actions, inactions, and knowledge of Defendant Wright Medical, as set forth above, Plaintiff Cheryl C. Rembisz has suffered the loss of consortium of her husband, Robert Rembisz.

## NEGLIGENT MISREPRESENTATION

331.   Plaintiffs incorporate by reference the facts and allegations set forth in paragraphs 1 through 276 above of this Complaint.

332.   In the exercise of reasonable care, Defendant Wright Medical should have known that its Profemur® Plus CoCr Modular Neck failed to comply with federal requirements for safe design, manufacture, warning, and labeling, yet it negligently misrepresented to Plaintiff Robert Rembisz, and/or his surgeon, that its Profemur® Plus CoCr Modular Neck was safe and met all applicable design, manufacturing, and warning requirements.

333.   Defendant Wright Medical made false representations and material omissions in its marketing, advertisements, promotions, and labeling concerning the Profemur® Plus CoCr Modular Neck for use in patients such as Plaintiff Robert Rembisz, and Defendant had a pecuniary interest in making these representations and omissions.

334.   Defendant Wright Medical, furthermore, in advertising, marketing, promoting, packaging, importing, distributing, and selling the Profemur® Plus CoCr Modular Neck negligently misrepresented material facts regarding their safety, history of without clinical failures, efficacy, guarantees of structural reliability, and guarantees of the absence of fretting corrosion.

335.   Defendant Wright Medical, in advertising, marketing, promoting, packaging, labeling, importing, distributing, and selling the Profemur hip, negligently misrepresented material facts regarding their safety, history of without clinical failures, efficacy, guarantees of structural reliability, and guarantees of the absence of fretting corrosion, by claiming the Profemur hip using the titanium Profemur modular neck had been adequately and reliably tested when, in fact, it had not.

336.    Defendant Wright Medical, in advertising, marketing, promoting, packaging, labeling, importing, distributing, and selling the Profemur® Plus CoCr Modular Neck negligently misrepresented material facts regarding their safety, history of without clinical failures, efficacy, guarantees of structural reliability, and guarantees of the absence of fretting corrosion, by claiming the risk of serious adverse events and/or effects from the Profemur hip using the titanium Profemur modular neck was comparable to that of other hip replacement systems when, in fact, it was not.

337.    Defendant Wright Medical, in advertising, marketing, promoting, packaging, labeling, importing, distributing, and selling the Profemur® Plus CoCr Modular Neck negligently misrepresented material facts regarding its safety, efficacy and fitness for human use by claiming the Profemur hip using the titanium Profemur modular neck had not caused or contributed to serious adverse events and/or effects requiring the premature explants of the device when, in fact, it had.

338.    Defendant Wright Medical, as manufacturer, distributor, and seller of medical devices for implantation, owed a duty of care to see that it communicated truthful information to Plaintiff Robert Rembisz and his surgeon, but negligently breached that duty by failing to exercise due care in its representations and omissions regarding the Profemur® Plus CoCr Modular Neck.

339.    Plaintiff Robert Rembisz and/or his surgeon justifiably relied upon Defendant's misrepresentation and omissions in its marketing, advertisements, promotions, and labeling concerning these products, including Defendant's representations that Profemur® Plus CoCr Modular Necks were safe for use in persons such as Plaintiff Robert Rembisz.

340.    As a direct and proximate result of Defendant Wright Medical's negligent misrepresentations and omissions related to the Profemur® Plus CoCr Modular Neck, Plaintiff

Robert Rembisz made the conscious and affirmative decision to proceed with hip replacement surgery with the Profemur® Plus CoCr Modular Neck.

341.    As a direct and proximate result of Defendant Wright Medical's negligent misrepresentations and omissions related to the Profemur® Plus CoCr Modular Neck, Plaintiff's surgeon Vincent Fowble, M.D., used the Profemur® Plus CoCr Modular Neck, in Plaintiff Robert Rembisz's June 14, 2010, index hip replacement surgery.

342.    Defendant Wright Medical, in advertising, marketing, promoting, packaging, labeling, distributing, and selling the Profemur® Plus CoCr Modular Neck negligently misrepresented material facts regarding its safety and efficacy.

343.    Defendant Wright Medical, as manufacturer, distributor, and seller of medical devices for implantation, owed a duty of care to see that it communicated truthful information to Plaintiff Robert Rembisz, and his surgeon as the learned intermediary, but negligently breached that duty by failing to exercise due care in its representations and omissions regarding the Profemur® Plus CoCr Modular Neck.

344.    Plaintiff Robert Rembisz, and/or his surgeon as the learned intermediary, justifiably relied upon Defendant's misrepresentation and omissions in its marketing, advertisements, promotions, and labeling concerning these products, including Defendant's representations that Profemur® Plus CoCr Modular Necks, were safe for use in persons such as Plaintiff Robert Rembisz.

345.    The representations made by Defendant Wright Medical regarding the Profemur® Plus CoCr Modular Neck and Profemur® Hip System were false, misleading, and negligent

misrepresentations as to the appropriateness of these devices for use of this product in Plaintiff Robert Rembisz.

346.    As a direct and proximate result of Defendant Wright Medical's negligent misrepresentations and omissions related to Profemur® Plus CoCr Modular Necks, which had been made by Wright Medical to his surgeon, Plaintiff Robert Rembisz made the conscious and affirmative decision to proceed with hip surgery on June 14, 2010, with the Profemur® Plus CoCr Modular Neck and Profemur® Hip System that Dr. Fowble recommended.

347.    As a direct and proximate result of Defendant Wright Medical's negligent misrepresentations and omissions related to the Profemur® Plus CoCr Modular Neck and Profemur® Hip System, Plaintiff's surgeon Vincent Fowble, M.D., used the Profemur® Plus CoCr Modular Neck and Profemur® Hip System in Plaintiff Robert Rembisz's June 14, 2010, surgery.

348.    As a direct and proximate result of Defendant Wright Medical's negligence, failure to exercise ordinary care, and other tortious and wrongful conduct as set forth herein, Plaintiff Robert Rembisz has suffered injuries and damages as set forth below.

349.    As a direct and proximate result of the negligence, conduct, actions, inactions, and knowledge of Defendant Wright Medical, as set forth above, Plaintiff Cheryl C. Rembisz has suffered the loss of consortium of her husband, Robert Rembisz.

## NEGLIGENT FAILURE TO WARN

350.    Plaintiffs incorporate by reference the facts and allegations set forth in paragraphs 1 through 276 above of this Complaint.

351.    At all times relevant herein, Defendant Wright Medical was engaged in the design, development, testing, manufacturing, importing, marketing, and sale of the Profemur® Plus CoCr Modular Neck and Profemur® Hip System.

352.    Defendant Wright Medical designed, manufactured, imported, marketed, distributed, and sold the Profemur® Plus CoCr Modular Neck and Profemur® Hip System to hospitals, to surgeons, and to potential patients knowing that it would then be implanted in patients in need of hip prosthesis with a wide variety of ages, height, body weight, activity levels, and lifestyles.

353.    Defendant Wright Medical distributed and sold the Profemur® Plus CoCr Modular Neck and Profemur® Hip System in a condition when they left their place of manufacture, in their original form of manufacture, which included the defects described herein.

354.    The Profemur® Plus CoCr Modular Neck and Profemur® Hip System was expected to and did reach Plaintiff Robert Rembisz and his implanting surgeon, Vincent Fowble, M.D., without substantial change in its condition as manufactured and sold by Defendant Wright Medical.

355.    Defendant Wright Medical's Profemur® Plus CoCr Modular Neck and Profemur® Hip System devices in general, were designed, developed, tested, manufactured, marketed, and sold or otherwise placed into the stream of commerce by Defendant Wright Medical in a dangerous and defective condition and posed a threat to most any and all users or consumers of these devices.

356.    At all times relevant herein, Plaintiff Robert Rembisz was a person who Defendant Wright Medical should have considered to be subject to the harm caused by the defective nature of the Profemur® Plus CoCr Modular Neck and Profemur® Hip System.

357.    Defendant Wright Medical's Profemur® Plus CoCr Modular Neck and Profemur® Hip System were implanted and used in the manner for which they were intended.

358.    Defendant Wright Medical knew or should have known through testing, adverse event reporting or otherwise, that the Profemur® Plus CoCr Modular Neck and Profemur® Hip System created a substantially higher risk of bodily injury and serious harm, from corrosion at the modular junctions than other available hip stem devices.

359.    Defendant Wright Medical had a duty to warn its sales representatives/distributors, purchasing hospitals, implanting surgeons such as Vincent Fowble, M.D., and patients, including Plaintiff Robert Rembisz, of this substantially higher risk of bodily injury and serious harm, from corrosion of the Profemur® Plus CoCr Modular Neck and Profemur® Hip System.

360.    Defendant Wright Medical breached its duty in that it failed to provide adequate and timely warnings or instructions regarding Profemur® Plus CoCr Modular Neck and Profemur® Hip System and their known defects.

361.    Defendant Wright Medical furthermore, breached its duty to warn at pre-surgery and/or post-surgery by (a) failing to adequately communicate the warning to its sales representatives/distributors, purchasing hospitals, surgeons, and/or to the ultimate users, patients such as Plaintiff Robert Rembisz; and/or (b) by failing to provide adequate warnings of the risk of corrosion of the modular junctions of the Profemur® Plus CoCr Modular Neck and Profemur® Hip System.

362.    Adequate efforts to communicate a warning to the ultimate users were not made by Defendant Wright Medical and, to the extent a warning was communicated by Defendant, the

warning was inadequate, all of which was negligent conduct on the part of Defendant Wright Medical.

363.    The warnings, pre-surgery and/or post-surgery, to Plaintiff Robert Rembisz and his implanting surgeon about the dangers the Profemur® Plus CoCr Modular Neck and Profemur® Hip System posed to consumers were inadequate.   Examples of Defendant Wright Medical's negligence in the lack and/or inadequacy of its warnings include, but are not limited to, one or more of the following particulars:

a.   the device contained warnings insufficient to alert Plaintiff Robert Rembisz and Plaintiff's surgeon as to the risk of adverse events, i.e., corrosion associated with the Profemur® Plus CoCr Modular Neck and Profemur® Hip System, subjecting Plaintiff Robert Rembisz to risks which exceeded the benefits of the device;

b.   the device contained misleading warnings emphasizing the efficacy of the device while downplaying the risks associated with it, thereby making use of the device more dangerous than the ordinary consumer would expect;

c.   the device contained insufficient and/or incorrect warnings to alert consumers, including Plaintiff Robert Rembisz, through their prescribing physicians regarding the risk, scope, propensity, frequency, duration, and severity of corrosion related failures associated with the Profemur® Plus CoCr Modular Neck and Profemur® Hip System;

d.   the device did not disclose that it was inadequately tested;

e.  the device failed to convey adequate post-marketing warnings regarding the risk, severity, propensity, frequency, scope and/or duration of the dangers posed by the device;

f.  the device failed to contain instructions sufficient to alert consumers to the dangers it posed and to give them the information necessary to avoid or mitigate those dangers;

g.  the device's warning against use in "obese" and/or active patients was insufficient and inadequate;

h.  the device's warnings, such as they were, regarding the use of these devices in patients engaged in active lifestyles, high impact activities, were insufficient and inadequate;

i.  the device's warnings, such as they were, regarding the use of these devices in heavier patients, were insufficient and inadequate; and,

j.  the device failed to communicate or failed to adequately communicate the events and conditions known to Wright Medical, set forth elsewhere above, incorporated herein by reference.

364.    Plaintiff Robert Rembisz used the Profemur® Plus CoCr Modular Neck and Profemur® Hip System:

a.  for its ordinary and intended purpose; and,

b.  for purposes demonstrated and represented by Wright Medical in its printed marketing and informational materials.

365.    Plaintiff Robert Rembisz could not have discovered any defect in the Profemur® Plus CoCr Modular Neck and Profemur® Hip System through the exercise of reasonable diligence or due care.

366.    Defendant Wright Medical, as the designer, manufacturer, importer, marketer, and distributor of medical devices are held to the level of knowledge of an expert in its field.

367.    Plaintiff Robert Rembisz and his implanting surgeon did not have substantially the same knowledge about the Profemur® Plus CoCr Modular Neck and Profemur® Hip System as Defendant Wright Medical who was the designer, manufacturer, importer, and/or distributor of the device.

368.    Defendant Wright Medical should have known if its Profemur® Plus CoCr Modular Neck and Profemur® Hip System devices were unsuited for active individuals such as Plaintiff Robert Rembisz, and expressly so stated in its instructional, marketing, and informational materials it published in paper, on the internet, in its IFUs and in the information it provided to its sales force and distributors.

369.    Vincent Fowble, M.D., a surgeon who implanted the Profemur® Plus CoCr Modular Neck and Profemur® Hip System, as the "learned intermediary" for the patient, here Plaintiff Robert Rembisz, had a right to know:

      a.  that Plaintiff Robert Rembisz was not an appropriate candidate for implantation of a Profemur® Plus CoCr Modular Neck and Profemur® Hip System; and,

      b.  that Wright Medical knew and expected that the Profemur® Plus CoCr Modular Neck and Profemur® Hip System was subject to fretting corrosion at the neck-stem junction.

370.    The conduct of Defendant, as set forth above, rendered the Profemur® Plus CoCr Modular Neck and Profemur® Hip System unreasonably dangerous.

371.    As a direct and proximate result of Defendant Wright Medical's failure to adequately warn, negligent failure to warn, and other wrongful conduct as set forth herein, Plaintiff Robert Rembisz has suffered injuries and damages.

372.    As a direct and proximate result of Defendant Wright Medical's failure to adequately warn, negligent failure to warn, and other wrongful conduct as set forth herein, Plaintiff Cheryl C. Rembisz has suffered the loss of consortium of her husband, Robert Rembisz.

## IMPLIED WARRANTY OF MERCHANTABILITY

373.    Plaintiffs incorporate by reference the facts and allegations set forth in paragraphs 1 through 276, above of this Complaint.

374.    Defendant Wright Medical had a duty to place into the stream of commerce, manufacture, import, distribute, market, promote and sell the Profemur® Plus CoCr Modular Necks and the Profemur® Hip System, (the "device"), so that it was fit for the ordinary purposes for which such goods are used, and neither defective nor unreasonably dangerous when put to the ordinary purposes for which such goods are manufactured, distributed, marketed, sold, and used.

375.    On and prior to June 14, 2010, Defendant Wright Medical was engaged in the business of designing, manufacturing, importing, marketing, distributing, and selling orthopedic hip implants and did design, manufacture, import distribute, market, and sell the Wright Medical Profemur® Plus CoCr Modular Neck and Profemur® Hip System.

376.    Defendant Wright Medical did in fact manufacture, sell, distribute, supply and/or promote the Profemur® Plus CoCr Modular Neck and Profemur® Hip System to Plaintiff Robert Rembisz, Jupiter Medical Center, and/or Plaintiff's surgeon.

377.    Defendant Wright Medical expected the Profemur® Plus CoCr Modular Necks and Profemur® Hip System it was manufacturing, marketing, distributing, supplying, promoting, and selling, to reach, and which did in fact reach, hospitals, implanting physicians, and consumers in the state of Florida, including Plaintiff Robert Rembisz, and/or Plaintiff's surgeon Vincent Fowble, M.D., without substantial change in its condition.

378.    At the time the Profemur® Plus CoCr Modular Neck and Profemur® Hip System left the possession of Defendant Wright Medical, and at the time the device entered the stream of commerce, it was not fit for the ordinary purposes for which such goods are used and was in an unreasonably dangerous or defective condition.  These defects include, but are not limited to, the following:

    a.  the device was not reasonably safe for the ordinary purposes for which such goods are intended to be used;

    b.  the device had an inadequate design for the purpose of hip replacement in the population it was intended to be used in and was marketed to;

    c.  the device contained unreasonably dangerous design defects, including an inherently unstable and defective design, i.e., use of titanium alloys in the modular neck, which resulted in an unreasonably high probability of corrosion leading to failure;

d.  the device's defective design resulted in a hip prosthesis that had risks which exceeded the utility of the medical device;

e.  the device was dangerous to an extent beyond which would be contemplated by the ordinary consumer;

f.  a reasonably prudent manufacturer, distributor, or seller, given knowledge of the device's condition, would not have marketed, distributed, or sold the device;

g.  the device was not appropriately or adequately tested before its distribution or sale; and,

h.  the device has an unreasonably high propensity for corrosion, fretting and fatigue failure under normal, intended, and expected use.

379.    At the time of Defendant Wright Medical's design, manufacture, importation, marketing, distribution, and sale of the Profemur® Plus CoCr Modular Neck and Profemur® Hip System, feasible, alternative safer designs for the device were known and available to Wright Medical, including, but not limited to, designs that utilized manufacturing and finishing processes that would make the modular neck stronger in this application, less susceptible to fretting and corrosion, and less likely to suffer a structural failure from fatigue than the design and processes that were in fact used by Wright Medical.

380.    At the time of Defendant Wright Medical's design, manufacture, importation, marketing, distribution, and sale of the Profemur® Plus CoCr Modular Neck and Profemur® Hip System feasible, alternative safer designs for the device were known and available to Wright Medical, including a monolithic or "monoblock" stem.

381.    Had Defendant Wright Medical properly and adequately tested the device, it would have discovered that over time the Profemur® Plus CoCr Modular Neck and Profemur® Hip System it designed would not withstand the stress it was expected to be subjected to in the ordinary and expected use of the device in a significant number of patients that it was intended to be used in, and marketed to be used in, and was certain to fail due to corrosion, and in some instances by fracture, in numbers and at rates significantly higher than expected, and was certain to fail in numbers and at rates significantly higher than other available alternative devices.

382.    Defendant's Profemur® Plus CoCr Modular Neck and Profemur® Hip System was, therefore, defective in design in that, when it left the hands of Defendant Wright Medical, the foreseeable risk of harm from the product exceeded or outweighed the benefit or utility of the device's design, and/or it was dangerous to an extent beyond which would be contemplated by the ordinary user or consumer.

383.    The foreseeable risks associated with the design of the Profemur® Plus CoCr Modular Neck and Profemur® Hip System devices include, but are not limited to, the fact that the design of the devices is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner.

384.    As a direct and proximate result of the conduct of Defendant Wright Medical as set forth herein, Plaintiff Robert Rembisz has suffered injuries and damages.

385.    As a direct and proximate result of the conduct of Defendant Wright Medical as set forth herein, Plaintiff Cheryl C. Rembisz has suffered the loss of consortium of her husband, Robert Rembisz.

## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

## FLA. STAT. § 501.201, et. seq.

386.    Plaintiffs incorporate by reference the above paragraphs 1 through 276 of this Complaint, as if fully set forth herein.

387.    To the extent that the law of Florida may be applicable to this claim, Plaintiff alleges that the conduct of Defendant Wright Medical, as set forth in this Complaint, is a violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et. seq.* [hereinafter at times referred to as the "FDUTPA"].

388.    Pursuant to the Florida Deceptive and Unfair Trade Practices Act any "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful.  Fla. Stat. § 501.204(1).

389.    At all times material herein, Defendant Wright Medical engaged in "trade or commerce," as defined by the FDUTPA by "advertising, soliciting, providing, offering, or distributing" its dangerous and defective Profemur® Plus CoCr Modular Neck and Profemur® Hip System.  Fla. Stat. § 501.203(8).

390.    Defendant Wright Medical warranted and represented that its Profemur® Plus CoCr Modular Neck and Profemur® Hip System were safe and free of defects in materials and workmanship.

391.    Defendant Wright Medical's failure to warn of its known Profemur® Plus CoCr Modular Neck and Profemur® Hip System defects was a material omission that would influence a reasonable consumer's decision whether to purchase its Profemur® Plus CoCr Modular Neck and Profemur® Hip System.

392.    Plaintiff is an "interested parties or persons" as defined by the FDUTPA. Fla. Stat. § 501.203(6).

393.    Plaintiff and his surgeon relied on the truth of Defendant Wright Medical's warranties and representations concerning the Profemur® Plus CoCr Modular Neck and Profemur® Hip System, and Plaintiff suffered personal damages as result of this reliance.

394.    Had Plaintiff been adequately warned concerning the Profemur® Plus CoCr Modular Neck and Profemur® Hip System he and his surgeon would not have used or purchased this product.

395.    As a result of these violations of the Florida Deceptive and Unfair Trade Practices Act, Plaintiff has incurred and will incur serious physical injuries, pain, suffering, and medical and hospital expenses and other expenses related to the diagnosis and treatment thereof, for which Defendant Wright Medical is liable.

396.    As a result of these violations of the Florida Deceptive and Unfair Trade Practices Act Plaintiff is entitled to his reasonable attorney's fees and costs from Defendant Wright Medical, pursuant to Fla. Stat. § 501.2105.

397.    As a direct and proximate result of the conduct of Defendant Wright Medical's violations of the Florida Deceptive and Unfair Trade Practices Act, as set forth herein, Plaintiff Cheryl C. Rembisz has suffered the loss of consortium of her husband, Robert Rembisz.

## DAMAGES FOR ALL CAUSES OF ACTION

398.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in this Complaint and for their damages for each cause of action further allege as follows:

399.    As a direct and proximate result of the failure of the Profemur® Plus CoCr Modular Neck, and the conduct, actions, inactions, and omissions of Defendant Wright Medical, Plaintiff Robert Rembisz has sustained injuries and damages including, but not limited to:

     a.  serious and permanent physical injuries to bone, muscle, tendons, tissues and nerves in his hip and pelvis;

     b.  undergoing surgery to remove and replace the failed Profemur® Plus CoCr Modular Neck and Profemur® Hip System and repair the damage that failure caused;

     c.  past and future pain, suffering, and anguish, both in mind and in body;

     d.  physical disability, past and future;

     e.  physical impairment;

     f.  disfigurement;

     g.  loss of enjoyment of life;

     h.  medical bills and expenses associated with the June 28, 2021, revision surgery, therapy, and recovery therefrom, in excess of $75,000;

     i.  future medical bills and expenses;

     j.  an award of up to three times, but not less than two times, the amount of actual damages awarded;

     k.  all other damages as allowed by Florida law;

     l.  prejudgment and post judgment interest as allowed by law; and,

     m. reasonable attorney fees and the costs and expenses of litigation as may be permitted by statute.

400.     As a direct and proximate result of the failure of the Profemur® Plus CoCr Modular Neck, and the conduct, actions, inactions, and omissions of Defendant Wright Medical, Plaintiff Cheryl C. Rembisz has suffered the loss of consortium of her husband, Robert Rembisz.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Robert Rembisz and Cheryl C. Rembisz demand judgment for compensatory damages in an amount that is fair and reasonable, double to treble actual damages, along with any and all damages and relief available under the law of the state of Florida, in an amount in excess of $75,000, exclusive of interest and costs; plus, prejudgment interest, post-judgment interest, attorney fees as allowed by law, and recoverable court costs.

### PLAINTIFFS DEMAND A TRIAL BY JURY

Respectfully submitted this 5th day of January 2022.

*George E. McLaughlin*

George E. McLaughlin, Colorado Bar #16364
McLaughlin Law Firm, P.C.
1890 Gaylord Street
Denver, CO 80206-1211
720-420-9800
GEM@McLLF.com